**AVECOR, INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Oil, Chemical and Atomic Workers International Union, Intervenor.**

No. 89–1643.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 30, 1990.

Decided April 26, 1991.

Rehearing and Rehearing En Banc Denied July 3, 1991.

Harold R. Weinrich, Washington, D.C., for petitioner. Ann Hale–Smith and Jeffrey M. Mintz, Atlanta, Ga., were on the brief for petitioner.

Judith P. Flower, Attorney, National Labor Relations Board ("NLRB"), with whom Aileen A. Armstrong, Deputy Associate General Counsel, and Barbara A. Atkin, Supervisory Atty., NLRB, Washington, D.C., were on the brief, for respondent.

John W. McKendree, Denver, Colo., and Lynn Agee, Memphis, Tenn., were on the brief, for intervenor.

Before BUCKLEY, WILLIAMS, and THOMAS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

After chemical plant workers voted against union representation, the union charged the employer with unfair labor practices. The administrative law judge concluded that the employer had indeed violated the National Labor Relations Act, that the violations invalidated the election, that the misconduct was so serious that a fair election was essentially impossible, and that the company must therefore bargain with the unelected union. The National Labor Relations Board affirmed the decision. We hold that the Board wrongly construed the firing of an employee as an unfair labor practice, neglected to explain its conclusion about the composition of the bargaining unit, and failed to undertake the proper inquiries and make the requisite findings before imposing the bargaining order.

## I. BACKGROUND

The basic facts are straightforward and undisputed. Avecor, Inc., operates a small chemical pigment plant in Vonore, Tennessee. The United Steelworkers attempted to organize plant workers in 1986, but, in an election conducted by the NLRB, the union received no votes. The Steelworkers did not charge the company with any unfair labor practices.

In the spring of 1987, some Avecor employees decided to try again with a different union. On April 23, quality control trainee Jeff Tidwell walked into the laboratory office, secured the telephone number for the Oil, Chemical and Atomic Workers International Union, and, in answer to a question, told his supervisor what he was doing. Another employee telephoned the union and arranged a meeting. The following day at midnight, about ten Avecor employees met union organizers at a service station. While there, Tidwell and several others signed union authorization cards. On April 30, the union petitioned the NLRB for an election. In a June 25 election, the union lost by a vote of twenty-two to ten, with five additional ballots challenged.

The union filed objections to the election and charged Avecor with unfair labor practices. An administrative law judge ("ALJ") held hearings in January and May–June 1988. In a decision issued September 30, 1988, he concluded that the company had engaged in various unlawful threats, promises, interrogations, and discharges. He set aside the election results and ordered the company to bargain with the union. Almost a year later, on September 22, 1989, the NLRB issued a decision that, with one minor and somewhat baffling exception, adopted all of the ALJ's findings and conclusions. *Avecor, Inc.*, 296 N.L.R.B. No. 94 (1989). This appeal followed.

## II. DISCUSSION

### A. Standard of Review

■ Our scope of review is limited. The Board's findings of fact, if supported by substantial evidence, are conclusive. 29 U.S.C. § 160(e) (1988); *see St. Agnes Medical Center v. NLRB*, 871 F.2d 137, 144 (D.C.Cir.1989). We owe substantial deference to inferences drawn from the facts, *see Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980); to choices of remedies, *see NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1940 n. 32, 23 L.Ed.2d 547 (1969); and, overall, to the "reasoned exercise of [the Board's] expert judgment," *Conair Corp. v. NLRB*, 721 F.2d 1355, 1373 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984).

We do not, however, merely rubber-stamp NLRB decisions. As we said in *Peoples Gas:*

> [T]his court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.

629 F.2d at 42.

### B. Unfair Labor Practices

The union charged the company with committing multiple unfair labor practices. The NLRB found merit in some charges and rejected others. As the union has not appealed the rejected ones, we deal here only with those that the Board credited and that the employer appeals.

#### 1. *Discharges*

Two provisions of the National Labor Relations Act ("NLRA") apply to improper terminations. Section 8(a)(1) provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Section 8(a)(3) forbids an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

■ Where a termination is alleged to be improper, the NLRB General Counsel bears the burden of demonstrating that "an antiunion animus contributed to the employer's decision to discharge an employee." *NLRB v. Transportation Mgt. Corp.*, 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983) (citing *Wright Line*, 251 N.L.R.B. 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989 (1982)). Circumstantial evidence will suffice. *See Property Resources Corp. v. NLRB*, 863 F.2d 964, 966–67 (D.C.Cir.1988).

■ Once the General Counsel has made this prima facie showing, the employer may negate the unfair labor practice finding by showing "by a preponderance of the evidence that the worker would have been fired even if he had not been involved with the union." *Transportation Management*, 462 U.S. at 395, 103 S.Ct. at 2471. Engaging in union activities does not shield an employee from being fired; the NLRA proscribes only terminations that are motivated by the union activities. *See Southwire Co. v. NLRB*, 820 F.2d 453, 459 (D.C. Cir.1987).

Here, the Board concluded that Avecor had improperly discharged two men, Jeff Tidwell and Leroy Hamby.

#### a. *Jeff Tidwell*

■ Tidwell's job was to test pigment samples to ensure that the color matched the customer's order. On April 24, 1987, he experienced trouble with a large order. Production had to be halted while he tried various adjustments. In frustration, Tidwell kicked cans and jugs while cursing loudly.

Three days later, the laboratory manager, Ed Pollard, accused Tidwell of having "lost his cool" and offered him a choice between demotion and a written warning. ALJ Decision at 24 (appendix to *Avecor,*

296 N.L.R.B. No. 94). Tidwell chose the latter. The next day he stopped by Pollard's office to secure the warning but was told that it was not yet ready.

Later that day, another supervisor instructed Tidwell to report to Pollard and Larry Willoughby, the plant manager. Willoughby told Tidwell that the quality control job seemed to be more than he could handle. Pollard had erred in offering the write-up or demotion choice, Willoughby continued, because the company's policy was that "if you don't make it, you go out the door." *Id.* Under that policy, he said, Tidwell was fired. Tidwell protested that he was not to blame for the problems he had encountered on the job and that, in any event, the company should not dismiss people who could ably handle other tasks at the plant. Willoughby was unswayed.

The ALJ concluded that the prima facie burden had been met. He found that Tidwell had secured the union telephone number, attended the midnight meeting, signed an authorization card, and persuaded another employee to sign a card. The ALJ also found that Avecor supervisors knew of the union from the outset and that Tidwell had discussed it with two supervisors. Finally, the ALJ believed that the circumstances of the firing suggested "disparate treatment" of Tidwell: "the questionable validity of the basis for the discharge, Respondent's change of position regarding the discipline imposed on Tidwell, and the timing of the discharge in relation to the beginning of the union activity." *Id.* at 25.

■ No evidence directly showed that Willoughby and Pollard, the supervisors who fired Tidwell, knew of his union activities. In concluding that they did have such knowledge, the ALJ presumably applied the small-plant doctrine, although he cited it only in connection with another matter. The doctrine "permits an inference that the company knew of the union activities of specific employees from evidence that union activities 'were carried on in such a manner, or at times that in the normal course of events, [the company] must have noticed them.'" *Chauffeurs, Teamsters & Helpers, Local 633 v. NLRB*, 509 F.2d 490,

496 (D.C.Cir.1974) (quoting *Hadley Mfg. Corp.*, 108 N.L.R.B. 1641, 1650 (1954)). In this case, the bargaining unit consisted of fewer than forty employees; the evidence supporting the prima facie showing, viewed through the small-plant doctrine, is ample.

Avecor argued that the upgraded discipline had a benign explanation that, if true, would rebut the prima facie showing and defeat the unfair labor practice charge. Tidwell's was not a first offense. After certain earlier outbursts, he had been disciplined and, in February 1987, warned that such conduct could cost him his job. The company president, Leonard Klarich, testified that he had instructed supervisors to fire Tidwell if he "ever again sounds off or loses control." ALJ Decision at 26. In Avecor's version of events, Pollard, a relatively new employee, was unaware of this history when he imposed the initial punishment. Klarich, who was out of town, ordered the firing when he learned by telephone of Tidwell's misbehavior. The company also cited Willoughby's policy against demoting inadequate employees as an additional legitimate justification. Thus, Avecor contended, the supervisors acted properly in firing Tidwell.

The ALJ refused to accept nearly every element of Avecor's explanation. Tidwell's earlier outburst had been "specifically different in type": racial slurs directed at a supervisor rather than an untargeted tantrum. *Id.* at 27. The company had not given him a written warning after the previous incident. His next job evaluation had been positive, had made no mention of the incident, and had resulted in a salary increase. Another supervisor, Sandy Thomas, evidently did not know of Klarich's instructions to fire Tidwell if he misbehaved again. No evidence indicated that Tidwell was at fault for the problems on the production line that provoked his tantrum. Willoughby's assertion that Pollard was a new employee "was never substantiated"; moreover, Avecor offered "no excuse for failing to advise [Pollard] of past job deficiencies of those relatively few people under his supervision" or for failing to advise

him of the alleged policy against demotions. *Id.* at 27 n. 15, 28.

Finally, the ALJ found Klarich's account of the firing implausible. Klarich testified that he ordered the discharge upon learning that Tidwell, in the ALJ's paraphrase, had "been involved in an incident." *Id.* at 27. According to the ALJ:

> Klarich admittedly did not seek to ascertain any facts of Tidwell's conduct on April 24 before directing the reversal of Pollard. There was no concern shown by Klarich for whether Tidwell had repeated the offense of issuing racial slurs which Klarich had found so reprehensible in the earlier incident. Even the fact that Klarich issued the discharge decision by telephone reflects the highly unusual treatment of the Tidwell situation. Klarich could not recall ... a previous decision to discharge a rank and file employee by telephone.

*Id.* at 28. He found, in short, that the company's decision to upgrade the discipline constituted "strong evidence of its unlawful motivation." *Id.*

We find one prong of the ALJ's argument unconvincing. A racial epithet directed at a supervisor is not "different in type" from a tantrum; a supervisor could reasonably view both as evidence of a temperament unsuited to quality control work. Otherwise the evidence cited by the ALJ appears sufficient. Avecor's alternative explanation for the Tidwell firing, while plausible, rests on too many unsupported assumptions to rebut the prima facie showing. Accordingly, we uphold the NLRB's conclusion that the Tidwell firing violated sections 8(a)(3) and (1) of the NLRA.

#### b. *Leroy Hamby*

■ Hamby was hired as a temporary maintenance helper in January 1987. In March he was given a choice between a lay-off or a demotion to janitor; Willoughby's no-demotion policy evidently was inapplicable. Hamby chose demotion. On April 27, Hamby secured a union authorization card from a fellow employee, Bucky Rodgers, and signed it. Four days later, Hamby's supervisor, Larry Murphy, fired

him for inefficiency. Hamby did not press Murphy for any further explanation.

The ALJ acknowledged that "[t]he weakness of the General Counsel's case" was the absence of any direct evidence that Avecor knew of Hamby's connection to the union. *Id.* at 33. Hamby had spoken with Bucky Rodgers and signed the authorization card. That five-minute encounter was the sum of Hamby's involvement with the union. It occurred on premises during work hours, but Hamby was on a break and, when he signed the card, no supervisors were present. While some supervisors believed at the time that Rodgers was a union supporter, *id.* at 34, there is no evidence that any of them was aware of his brief encounter with Hamby. As will be detailed below, Hamby had twice discussed the union with supervisors; in neither instance, however, had he revealed his own sentiments.

The ALJ nevertheless concluded that the company knew of Hamby's involvement. First, Avecor submitted no evidence supporting the allegation that Hamby had been a poor employee. Second, at the time Hamby talked with Rodgers and signed the card, supervisor Murphy was closely monitoring Hamby's work performance in preparation for firing him. The implication, which the ALJ did not spell out, appears to be that Murphy probably saw Hamby and Rodgers together, and concluded that Hamby was a union supporter. Finally, four days after signing the union card, Hamby was fired.

Here the ALJ expressly applied the small-plant doctrine. He explained: "Respondent employed less than 40 unit employees, and the plant was located in a small community. It was aware early on of union talk among its employees and specifically aware of the first union meeting after the second shift on April 24." *Id.* at 33–34. The evidence, as amplified through the small-plant doctrine, led the ALJ to conclude that "it may be fairly inferred that Respondent was aware of Hamby's union involvement." *Id.* at 34.

The evidence supporting that inference is, we find, far from substantial. Murphy's

testimony suggests that he might not have begun monitoring Hamby until sometime after the Rodgers encounter. In any event, Murphy would have had no reason to watch Hamby's work performance during a break.

Even if Murphy knew of it at the time, the fact that Hamby was talking to Rodgers revealed nothing about Hamby's union sympathies. What the NLRB terms Hamby's "propensity to talk to other employees," Brief for Respondent at 36, was no secret to Avecor supervisors. Indeed, Murphy testified that the firing came about partly because Hamby spent too much time chatting with co-workers and neglecting his janitorial duties.

■ A discharge cannot stem from an improper motivation where the employer is ignorant of the employee's union activity. *See Chauffeurs, Teamsters & Helpers*, 509 F.2d at 496 n. 27. Hamby's activity was isolated, brief, and not especially public. The small-plant doctrine reduces the weight of evidence necessary to impute knowledge of union activities to supervisors, but, as the Sixth Circuit noted, the doctrine does not wholly eliminate the need for evidence:

> The small size of the facility ... does not give rise to a *presumption* of knowledge that an employer must rebut to prevent establishment of the Board's prima facie case. Rather, the doctrine permits an inference of employer knowledge only if the Board establishes by other evidence, direct or circumstantial, that an employer had reason to notice the union activities in the facility.

*NLRB v. Health Care Logistics, Inc.*, 784 F.2d 232, 236 (6th Cir.1986) (emphasis in original). Even in a tiny plant with strongly anti-union management, supervisors are not omniscient. Because there is no substantial evidence that Avecor knew of Hamby's union activity, we conclude that the prima facie showing was not made. We therefore set aside the finding that Hamby's discharge violated the NLRA.

### 2. Interrogations

■ An employer violates section 8(a)(1) when he "coercively interrogates employees about their union activities and sympathies." *St. Agnes*, 871 F.2d at 143. Whether a particular encounter amounts to coercive interrogation depends on the totality of the circumstances. *Id.*

■ Here, the ALJ concluded that Willoughby, the plant manager, had improperly questioned two employees about their union sympathies. On April 27 or 28, he asked Darrell Martin if he knew anything about the union. Martin replied that he preferred not to discuss it. Willoughby asked if Martin was for or against the union. Martin responded, according to the ALJ, "with a crude and vulgar analogy indicating his support of the Union." Willoughby let the matter drop. ALJ Decision at 9. On about June 20, Willoughby asked James White how he felt about the union and whether he had signed an authorization card. White replied that he did not know "a whole lot" about the union. He added, untruthfully, that he had not signed a card. *Id.* at 10. Avecor does not dispute these findings. We grant the Board's petition to enforce this part of its order.

### 3. Promises and threats

■ An employer violates section 8(a)(1) by threatening to penalize employees if they choose union representation, *see Southwire*, 820 F.2d at 457, or by offering to reward employees if they reject it, *see St. Agnes*, 871 F.2d at 143. "[W]e 'recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship.'" *Id.* (quoting *Gissel*, 395 U.S. at 620, 89 S.Ct. at 1943).

■ Here, the ALJ found several violations. Within a few days before the April 24 midnight meeting, janitor Hamby asked supervisor Joe Ingram what he thought about the union. Ingram replied "that the Union would cause the company to close the doors." ALJ Decision at 8. On April 27, the loquacious Hamby asked Denver Millsaps, the production manager, why the supervisors had held a meeting that afternoon. Millsaps replied that they had discussed whether to increase the pay of machine operators in order to keep the union

out. Hamby asked if anything had been said about his own wages. Millsaps told Hamby to raise the matter with his supervisor. Prior to May 14, plant manager Willoughby told a fellow supervisor, Carl Farrell, that the company would pay fifty dollars to any employee who would rescind his union authorization. Farrell passed the offer on to Mac Coley, a quality control employee. On or about May 14, Willoughby told the assembled employees that if the union represented them, the company would deal more strictly with rulebreakers, whereas without a union, the company would be more generous with benefits. At the same gathering, president Klarich said that employees could expect more raises without a union. Finally, a few days before the election, Willoughby told the unit employees not to expect any more favors if they chose the union.

Avecor raises a number of arguments, only one of which merits discussion. The company argues that Ingram's prediction of a plant closure was harmless because Hamby signed a union authorization card three days later. The remark could not have been coercive, Avecor suggests, because Hamby was not coerced. The argument, however, misstates the law. We look at a remark's tendency to coerce, not at its actual impact. *See Southwest Regional Joint Bd. v. NLRB*, 441 F.2d 1027, 1031 (D.C.Cir.1970).

The ALJ's interpretation of the Ingram remark does give us pause, but for a different reason. The evidence shows that one supervisor, on one occasion, in response to a direct question, in the hearing of one employee, said that the plant would close if the union were elected. The objective facts, we think, fall short of the ALJ's conclusion that Avecor had committed a "hallmark" violation of the NLRA by "[t]hreatening its employees that it would close its doors if they selected the Union to represent them." ALJ Decision at 49, 51. *Cf. Montgomery Ward & Co. v. NLRB*, 904 F.2d 1156, 1161 (7th Cir.1990) (Easterbrook, J., concurring) ("If employees are indeed such wee, tim'rous beasties, then elections are pointless....").

We defer to the ALJ's conclusion that the Ingram remark violated the Act, though it skirts the outermost boundaries of our deference. We find that substantial evidence supports the other violations.

C. Bargaining Unit

■ When it sets out *de novo* to define a bargaining unit, the NLRB determines which employees share common interests such that they could fruitfully bargain in concert. *See NLRB v. Action Automotive, Inc.*, 469 U.S. 490, 494, 105 S.Ct. 984, 987, 83 L.Ed.2d 986 (1985). This is a matter for the Board's expertise, and we will rarely disturb its conclusion. *See id.* at 496, 105 S.Ct. at 988.

■ When the parties stipulate the bargaining unit, however, the Board has a more limited role. First it must ensure that the stipulated terms do not conflict with fundamental labor principles. Having done so, its task is simply to enforce the agreement. If the terms of the stipulation are unambiguous, the Board must hold the parties to its text. If the terms are ambiguous, the Board may look to the usual factors governing the definition of an "appropriate unit," including the community-of-interest standard. *See NLRB v. Speedway Petroleum*, 768 F.2d 151, 155–56 (7th Cir.1985); *International Union of Elec., Radio & Mach. Workers v. NLRB*, 418 F.2d 1191, 1199 (D.C.Cir.1969).

■ Here, Avecor and the union stipulated this definition of the bargaining unit:

All production and maintenance employees employed by the Employer at its Vonore, Tennessee facility, including leadmen, laboratory employees, dry color employees, shipping and receiving employees, liquid employees and quality control employees, but excluding all office clerical employees, guards and supervisors as defined in the Act.

ALJ Decision at 41. The parties subsequently disagreed about whether this stipulated unit included two particular employees. Avecor argued that they were "plant clericals" who belonged in the unit; the union contended that they were "office

clerical employees" who belonged outside it. Because the two did not sign union authorization cards, their presence would erode and for some periods extinguish the union's majority support.

The ALJ described the two employees' work locations, duties, and other aspects of their jobs. Order entry clerk Lisa McWaters worked in the main office, alongside the office clerical employees. Lab secretary Diane Byrum worked in the lab manager's office, which was adjacent to the main office. The ALJ wrote:

> I conclude that McWaters and Byrum's work interests were more closely associated with that of office clericals than unit employees by virtue not only of their work location but also their job duties and working conditions. Neither performed production work of any type even on a sporadic or part time basis. They worked different hours from most of the production employees. That Respondent itself viewed [them] as being more closely associated with clerical employees in interests was demonstrated by its failure to grant them the 40 cent per hour increase granted the unit employees in May. The lab manager's use of Byrum to type a personnel memo reflects the same point. While the paperwork generated by Byrum and McWaters related to production work their direct contact with unit employees does not appear to be extensive or significantly greater than their contact with office clericals. Accordingly, I conclude that Byrum and McWaters do not have a sufficient community of interests with production unit employees to warrant their inclusion in the unit.

*Id.* at 42–43. The Board adopted the finding regarding McWaters but declined to reach that regarding Byrum. The NLRB explained that "we find it unnecessary to pass on Byrum's status" because her presence in the unit would not have deprived the union of its majority support. 296 N.L.R.B. No. 94, at 2 n. 3.

The treatment of this issue is flawed on three grounds. First, we are troubled that neither the ALJ nor the Board acknowledged the limited nature of their task: to interpret and enforce the parties' stipulation, and to consider NLRB doctrines only insofar as the stipulation was ambiguous.

Second, we are unable to ascertain the Board's intent concerning Byrum. The Board ordered the company to bargain with the union as representative of employees in the bargaining unit. Byrum's status may not affect the union's card majority, but it will determine Byrum's (or her successor's) potential for membership in the union. Does "we find it unnecessary to pass on Byrum's status" place her in the unit or out of it? We cannot defer to what we cannot decipher.

Finally, and most importantly, the Board failed to distinguish what appears to be a controlling precedent. In *Columbia Textile Services, Inc.,* 293 N.L.R.B. No. 127 (1989), the two disputed clerical employees worked in an enclosed office; they answered to the office clerical supervisor; they ate separately from production personnel; and they performed purely clerical tasks. Nevertheless, the Board reversed the ALJ and included the two in the production bargaining unit because they had significant contact with production employees and because they "perform[ed] duties that are functionally integrated with the production process." *Id.* at 12. The same could be said of Byrum and McWaters.

The Board issued *Columbia Textile* while the ALJ's recommended Avecor decision was awaiting review. "When the Board adopts an ALJ opinion that is in tension with intervening Board precedent, a duty arises for the Board to explain the significant conflicts." *United Food & Commercial Workers Int'l Union, Local 150–A v. NLRB,* 880 F.2d 1422, 1437 (D.C. Cir.1989). By neglecting to mention *Columbia Textile,* the Board disregarded this duty.

On remand, accordingly, the Board must address the applicability of *Columbia Textile* and decide where Byrum and McWaters belong.

### D. Election

■ The union filed twenty-two objections to the election but subsequently with-

drew twelve of them. Of the ten remaining, the ALJ found merit in only one:

Hamby's discharge occurred within the critical period between the filing of the petition and the holding of the election. Generally, conduct which violates Section 8(a)(1) of the Act is, a fortiori, conduct which interferes with the election. I find this objection has merit.

ALJ Decision at 39 (citation omitted). The ALJ went on to find that other violations, to which the union had not specifically objected, had also tainted the election. Accordingly, he concluded, the election must be set aside.

■ Avecor asks that we vacate the Board's order in its entirety. The company does not contend, however, that the election adequately measured employee sentiment. Although we have ruled that the ALJ's finding with regard to Hamby's discharge was flawed, we nevertheless acknowledge that the Board has "particularly broad discretion" to decide whether electoral conditions have so deteriorated that the results must be dismissed. *Amalgamated Clothing & Textile Workers Union v. NLRB*, 736 F.2d 1559, 1562 (D.C.Cir.1984). Its determination here was not an abuse of discretion.

### E. Bargaining Order

#### 1. *General principles*

■ Freedom of employee choice is "a matter at the very center of our national labor relations policy," *Conair*, 721 F.2d at 1377–78, and a secret election is the preferred method of gauging choice, *see Gissel*, 395 U.S. at 602, 89 S.Ct. at 1934; *NLRB v. Creative Food Design, Ltd.*, 852 F.2d 1295, 1302 (D.C.Cir.1988). The fact that an employer's actions have tainted one election does not necessarily mean that subsequent elections will also be tainted. Where a fair rerun election is possible, it must be held. *See St. Agnes*, 871 F.2d at 147.

■ There are times, however, when one will not be possible. Where the employer's unfair labor practices have been "so pervasive and extensive that they ef-

fectively prevent the holding of a fair election," the Board may order the employer to bargain with a union that had secured cards from a majority of unit employees but failed in the ensuing election to receive a majority vote. *Amazing Stores, Inc. v. NLRB*, 887 F.2d 328, 330 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990). Under the Supreme Court's decision in *Gissel*, the Board may issue a bargaining order in two categories of cases: "exceptional cases marked by outrageous and pervasive unfair labor practices" ("category I") and "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process" ("category II"). *Gissel*, 395 U.S. at 613–14, 89 S.Ct. at 1939–40 (internal quotes omitted). Here, the ALJ concluded that Avecor's violations "fall within the second *Gissel* category." ALJ Decision at 48.

■ We have described a bargaining order as an "'extraordinary remedy'" that is not "'automatically entitled to enforcement.'" *NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 442–43 (D.C.Cir. 1972) (quoting *NLRB v. American Cable Sys., Inc.*, 427 F.2d 446, 448 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970)). Before we will enforce a category II order, we must find that substantial evidence supports three conclusions:

First, the Union, at some time, must have had majority support within the bargaining unit. Second, the employer's unfair labor practices must have had the tendency to undermine majority strength and impede the election process. Finally, the Board must determine that the possibility of erasing the effects of past practices and of ensuring a fair rerun election by the use of traditional remedies is slight and that employee sentiment once expressed in favor of the Union would be better protected by a bargaining order.

*St. Francis Fed'n of Nurses & Health Professionals v. NLRB*, 729 F.2d 844, 854–55 (D.C.Cir.1984). The third finding, in addition, must be supported by a reasoned

explanation that addresses several subissues. *See Peoples Gas*, 629 F.2d at 46. Here, only the first two requirements are met.

## 2. St. Francis *test applied*
### a. *Card majority*

 The Board has the authority to issue a category II bargaining order "even where it is clear that the union, which once had possession of cards from a majority of the employees, represents only a minority when the bargaining order is entered." *Gissel*, 395 U.S. at 610, 89 S.Ct. at 1938. There is no dispute here that the union had a card majority for at least a brief period. Avecor argues that we should not impose a bargaining order where the majority was so ephemeral.

The duration of the card majority depends on whether the Board includes the two disputed clerical employees in the bargaining unit. Excluding them both, as the ALJ did, produces a majority that lasts for all but four days of the two-month pre-election period. With one of them in the unit and one outside it, the majority's lifespan shrinks to twelve days. With both of them in the unit, the majority survives for just one day.

We have no inkling of where the Board will place the two employees. *Gissel*, though, instructs us that the Board must only make "a showing that at one point the union had a majority." *Id.* at 614, 89 S.Ct. at 1940. That showing has been made. We are unaware of any requirement that the card majority must survive for a particular duration in order to support a bargaining order, and we decline to introduce one here.

### b. *Impact of employer's actions*

 Avecor also argues that it was not responsible for the demise of the card majority. It notes that another court vacated a bargaining order where the union's loss of majority support occurred "through no activity by the employer and prior to any employer violations." *Struthers–Dunn, Inc. v. NLRB*, 574 F.2d 796, 802 (3d Cir. 1978).

Here, however, Avecor's unfair practices were well underway before the union lost its majority status. With both disputed employees in the bargaining unit, the union had a card majority from April 27 to 28. On or before April 28, Ingram told Hamby that the plant would close if it was unionized, Millsaps told Hamby that the company might raise the pay of machine operators to keep the union out, Willoughby fired Tidwell, and Willoughby interrogated Martin about his union views. Even if these actions did not cause Coley to withdraw his card—the April 28 event that deprived the union of its majority—they may well have kept other employees from signing cards, and thereby prevented the union from increasing its majority prior to April 28 or from regaining it thereafter. If Byrum or McWaters is ultimately excluded from the unit, the union regained its card majority between May 5 and 15. Additional unfair labor practices, including Klarich's and Willoughby's coercive remarks to the assembled employees, occurred during this period. These practices meet the minimum requirements of the second *St. Francis* test: Taken together, they will support an inference that Avecor's actions "had the tendency to undermine majority strength and impede the election process." 729 F.2d at 854.

### c. *Effectiveness of traditional remedies*

 This factor is frequently dispositive. The normal cure for an unfair election is a fair election, and the Board wields an array of remedies to enhance its likelihood. The Board may order the employer, for example, to cease and desist his unfair practices, to post a notice or read one aloud, and to reinstate and reimburse unlawfully discharged employees. *See St. Agnes*, 871 F.2d at 147; *Conair*, 721 F.2d at 1385–87. A bargaining order is appropriate only where the unfair practices have so intimidated employees that an election, even with the full complement of traditional NLRB remedies, would not reflect their true sentiments.

 Three factors preclude enforcement of the bargaining order here. First,

our conclusions above have extinguished at least one of the "hallmark violations" supporting the order, the Hamby termination. Second, the ALJ and the Board failed to consider turnover in the bargaining unit. Third, the ALJ and the Board failed to explain why they concluded that a bargaining order is essential, an explanation that our precedents emphatically mandate. *See, e.g., Amazing Stores*, 887 F.2d at 330–31; *Peoples Gas*, 629 F.2d at 45–46.

### (i) Hallmark violations

The ALJ spoke of Avecor's "hallmark" violations, which he defined as "[p]articularly pervasive unfair labor practices which are deemed highly coercive and are likely to have a longer lasting and inhibitive [e]ffect on a substantial percentage of the work force." ALJ Decision at 48. He emphasized the firings of Tidwell and Hamby, which he characterized as "an unlawful discharge of roughly 6 percent of the unit" that was "likely to have a substantial and lasting impact on employee free choice," *id.*, and Ingram's statement to Hamby that the company might close its doors if the union won. He also noted that many of the violations were especially coercive because they were committed by high management officials.

We have concluded that the Hamby firing was not unlawful, and we have suggested that Ingram's isolated remark to Hamby was less heinous than the ALJ painted it. Consequently, "a significant question is presented whether the remaining unfair labor practices in this case are serious enough, or pervasive enough, to have the tendency to undermine majority strength and prevent the holding of a fair rerun election." *Pedro's, Inc. v. NLRB*, 652 F.2d 1005, 1011 (D.C.Cir.1981). The Board must, therefore, consider whether the remaining violations justify a bargaining order.

### (ii) Turnover

■ A bargaining order is appropriate where the employer has so polluted the electoral process that the wishes of the employees will be better reflected by an old card majority than by a new election. Substantial changes in the workplace, however, may render that finding untenable. Where many of the intimidated employees have moved on, and where the company is under order not to resume its unlawful ways, a fair election may well be possible. A bargaining order in those circumstances may unjustly bind new employees to the preferences of departed ones. "Where a remedial order has the primary effect of negating the rights of current employees rather than furthering them, it defeats, rather than effectuates, the policies of the N.L.R.A." *Ship Shape Maintenance*, 474 F.2d at 443 (footnote omitted); *see also Creative Food Design*, 852 F.2d at 1302–03.

According to the company, the bargaining unit had changed considerably as a result of growth and turnover. The company submitted evidence indicating that as of May 27, 1988, only about half of the workers in the bargaining unit had been in its employ at the time of the election. The ALJ refused to consider this evidence. He explained: "The Board, as distinguished from the position of some of its members, has not included turnover as a factor in determining the appropriateness of [a] bargaining order remedy." ALJ Decision at 48 n. 28. The Board adopted this conclusion without comment.

The circuit courts have reached divergent conclusions as to whether post-election events, including turnover, should be taken into consideration in determining the need for a bargaining order. *See Peoples Gas*, 629 F.2d at 45 n. 18, 47–48; Note, *"After All, Tomorrow Is Another Day": Should Subsequent Events Affect the Validity of Bargaining Orders?*, 31 Stan.L.Rev. 505, 512–21 (1979) (citing cases). Indeed, our own cases have not been wholly consistent. *Compare Creative Food Design*, 852 F.2d at 1302 (Board must always consider turnover before issuing a *Gissel* bargaining order), *Pedro's*, 652 F.2d at 1012 (Board must always consider conditions that exist at time it enters bargaining order), and *Peoples Gas*, 629 F.2d at 45–46 n. 18 (same), *with St. Francis*, 729 F.2d at 856 (though precedents require Board to con-

sider "specific significant events," court has "never ... imposed a blanket requirement on the Board that it consider subsequent events before issuing a bargaining order").

In our most recent examination of this issue, in which we discussed *Gissel* orders generally, we concluded that the Board must consider turnover unless it finds that the employer's practices are particularly flagrant:

> [D]etermination of whether a *Gissel* order is necessary rests on consideration of both the nature and pervasiveness of the employer's misconduct as well as the amount of turnover. Where the Board finds that a practice is particularly pervasive or enduring, it need make only minimal findings that the effects have not been dissipated by subsequent employee turnover. Conversely, where the practices at issue are not especially pervasive or permanent in nature, the Board needs to make more careful determinations respecting the effect of subsequent employee turnover.

*Amazing Stores,* 887 F.2d at 331. We then added, however, that

> [w]here the Board finds that employer misconduct is pervasive and likely to persist despite turnover, these conditions alone are sufficient to satisfy the turnover inquiry.

*Id.*

■ In *Amazing Stores,* we were dealing with a category I case. We spoke of the "extreme, pervasive, and entrenched character of the [employer's] misconduct," *id.,* and, borrowing the Supreme Court's characterization of category I in *Gissel,* we described its anti-union activities as "outrageous and pervasive." *Id.* at 329; *cf. Gissel,* 395 U.S. at 613, 89 S.Ct. at 1940. In the instant case, however, we are dealing with a category II situation, which the ALJ defined as a "less extraordinary case[ ] marked by less pervasive unfair labor practices which nonetheless have a tendency to undermine majority strength." ALJ Decision at 47. Based on this distinction, and in the interest of clarifying this area of our case law, we hold that before issuing a

category II bargaining order, the Board must carefully consider employee turnover.

Thus, if on remand the Board continues to believe, in the light of our findings, that a bargaining order may still be indicated, it must take account of the turnover. Moreover, it must examine the turnover that has occurred up to the time it would issue the new order. As we explained in *Pedro's:*

> In considering whether a bargaining order may issue, ... we emphasize that the Board must ... consider the conditions in the bargaining unit at the time it renders its decision on remand. As stated by this court in *Peoples Gas,* "[w]e think it clear that no responsible decision-making body can formulate a reasonable remedy without taking into account conditions at the time its order is entered."

*Pedro's,* 652 F.2d at 1012 (quoting *Peoples Gas,* 629 F.2d at 45 n. 18) (citations omitted). The question the Board will have to determine is whether the company's actions in the spring of 1987 left so lasting an imprint that a fair rerun election cannot be assured; or whether, to the contrary, "changes in the Company's work force have made a bargaining order now inappropriate, even if one might have been appropriate at some earlier time." *NLRB v. Pace Oldsmobile, Inc.,* 681 F.2d 99, 102 (2d Cir.1982) (per curiam).

### (iii) Reasoned explanation

■ In *Peoples Gas,* we refused to enforce a bargaining order for want of a reasoned justification. We explained:

> Before the Board is entitled to the considerable respect and deference with which we normally approach any review of its choice of remedy, its orders must reflect a responsible exercise of discretion and clearly articulate the basis for its decision. A remedial order should recognize the competing considerations which are potentially affected by the remedy chosen, be grounded in factual determinations rather than speculation, and explain how, in light of present circumstances[,] its remedy can be expected to effectuate the purposes of the Act.

*Peoples Gas,* 629 F.2d at 45 (footnote omitted). We went on to hold that

> before we will enforce a bargaining order, we must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive to employees' rights, are not adequate.

*Id.* at 46; *see also Amazing Stores,* 887 F.2d at 330–31 (applying same factors).

Here, the ALJ briefly discussed the first two factors. He acknowledged in passing that a secret ballot election is the preferred measure of employee choice; and with respect to the "other purposes" that he believed should override the Avecor employees' section 7 rights, he detailed the company's violations and their potential impact on the employees' freedom of choice. He made no mention, however, of turnover; in fact, he refused to accept evidence on the subject.

As to the inadequacy of traditional remedies, the ALJ wrote:

> Considering the total circumstances of this case and all those factors noted above regarding the small size of the unit, the unlawful discharge of two employees, the likely impact of all the unlawful conduct on unit employees, and the fact that much of the unlawful conduct was committed by high Respondent officials, I find that it is improbable that the use of traditional remedies here would be sufficient to ensure a fair rerun election.

ALJ Decision at 50. This is a promising topic sentence; unfortunately, no elaboration follows. The ALJ never explained why the cloud created by these violations was likely to linger. He pointed to no evidence, for example, that the managers would resume their anti-union practices. *See Amazing Stores,* 887 F.2d at 331. He never explored the possibility that other remedies might cleanse the environment enough to permit a fair election. Instead he offered only "conclusory statements that a fair rerun election cannot be held." *St. Agnes,* 871 F.2d at 148. We require a more comprehensive accounting.

The need for a real demonstration of the inadequacy of alternative remedies is particularly acute, of course, in a case such as the present one, where the Board relies on a weakly supported inference for its belief that the unfair practices undermined the election that immediately followed them. If the basis for thinking that the unfair labor practices affected that election is weak, a claim that they would fatally contaminate a new election months or years later is even weaker.

Our insistence on a full explanation is not the caprice of one crotchety circuit. As we pointed out in *St. Agnes, id.* at 148–49, other courts are equally adamant that a bargaining order must be accompanied by something meatier than "because I say so." *See, e.g., M.P.C. Plating, Inc. v. NLRB,* 912 F.2d 883, 888–89 (6th Cir.1990) (remanding with instructions not to issue bargaining order where Board failed to provide requisite analysis); *Montgomery Ward & Co. v. NLRB,* 904 F.2d 1156, 1159–60 (7th Cir.1990) (remanding where Board failed to explain why traditional remedies would be inadequate); *NLRB v. American Spring Bed Mfg. Co.,* 670 F.2d 1236, 1247–49 (1st Cir.1982) (remanding with instructions to hold election where Board failed to explain why fair election was unlikely); *see also NLRB v. Pace Oldsmobile, Inc.,* 739 F.2d 108, 111–12 (2d Cir.1984) (vacating bargaining order without remand where Board provided only conclusory analysis); *NLRB v. Apple Tree Chevrolet, Inc.,* 671 F.2d 838, 841–42 (4th Cir.1982) (same); *NLRB v. Gibson Prods. Co.,* 494 F.2d 762, 766–70 (5th Cir.1974) (same); T. Kheel, *Labor Law* § 15.05, at 15.41 n. 14 (1989) (citing additional cases).

The courts have imposed these requirements because of the Board's evident partiality for bargaining orders. *See NLRB v. J. Coty Messenger Serv.,* 763 F.2d 92, 101 (2d Cir.1985). We emphasize once again that a bargaining order is not a snake-oil

cure for whatever ails the workplace; it is an "extreme remedy," *St. Agnes,* 871 F.2d at 147, that must be applied with commensurate care. By requiring specific findings, the courts try to keep the Board from overprescribing.

### III. CONCLUSION

All violations except the Hamby termination rest on substantial evidence. The Board must more fully explain its interpretation of the parties' bargaining-unit stipulation, particularly the apparent deviation from Board precedent; and it must decide whether the disputed employees belong in the unit. If the Board wishes to stand by its decision to issue a bargaining order, it must accept evidence on employee turnover that has occurred up to the time it issues the order, and explain convincingly why the turnover has not cleared the air of the unfair practices and why traditional remedies could not reasonably ensure a fair election.

Accordingly, we enforce the Board's order in part, grant the petition for review in part, vacate the bargaining order, and remand to the Board for proceedings consistent with this opinion.

*So ordered.*