**DACAS NURSING SUPPORT SYSTEMS, INC., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 92–5973, 92–6113.

United States Court of Appeals, Sixth Circuit.

Argued June 24, 1993.

Decided Oct. 14, 1993.

Tim Tusek (argued and briefed), Youngstown, OH, for petitioner cross-respondent.

Frederick Calatrello, Director, John Kollar, N.L.R.B., Cleveland, OH, Aileen A. Armstrong, Deputy Asso. Gen. Counsel, Paul J. Spielberg, Robert N. Herman (argued and briefed), N.L.R.B., Washington, DC, for respondent cross-petitioner.

Before: KENNEDY and NORRIS, Circuit Judges; and ENGEL, Senior Circuit Judge.

ENGEL, Senior Circuit Judge.

Dacas Nursing Support Systems, Inc. ("Dacas") has petitioned for review of an order of the National Labor Relations Board ("NLRB" or "Board") requiring Dacas to collectively bargain with the Ohio Nurses Association ("ONA" or "Union"). The NLRB has filed a cross-application seeking enforcement of its order. We must decide whether the NLRB correctly sustained the Union's objection to the ballot of one of Dacas' nurses. Because we conclude that the NLRB erred in sustaining the objection, we grant Dacas' petition for review and deny the NLRB's cross-application for enforcement.

## I. BACKGROUND

Dacas provides home health-aid services to its clients. It employs, among others, three types of registered nurses: full-time, part-time, and per diem. Full-time nurses work 2,000 hours per year based on 40–hour work weeks. Part-time nurses are expected to work at least 1,000 hours per year. Per diem nurses, however, work on an as-needed basis, and Dacas neither guarantees nor expects that they will work a particular amount of hours each year. Per diem nurses can refuse nursing assignments, and they usually are called when full- and part-time staff need assistance with case overflows. During the time relevant to this appeal, Dacas employed approximately 10 per diem nurses. While the number of hours each per diem nurse works varies, most work between 300 to 400 hours per quarter.

In early 1991, ONA attempted to become the collective bargaining representative for all non-supervisory registered nurses at Dacas. When the company declined to recognize ONA, the Union filed a formal application which, among other things, triggered the scheduling of an election. Dacas and ONA originally were unable to agree upon who should vote. ONA wanted per diem nurses to participate, Dacas did not. Accordingly, a hearing was scheduled to determine the appropriate bargaining unit. Prior to the hearing's conclusion, however, the parties entered into a stipulated election agreement as to the following unit:

> All full-time, regular part-time, and per diem non-supervisory registered nurses employed by the Employer at its 101 Federal Plaza East, Suite 204, Youngstown, Ohio facility, excluding all office clerical employees and all guards and supervisors as defined in the Act and all other employees.

According to ONA, it relied upon an informal Dacas telephone list when negotiating over the appropriate bargaining unit. Full- and part-time nurses use this list to obtain per diem assistance when needed. Significantly, one of the per diem nurses, Patty Dalleske, was not on the telephone list. Dacas has employed Dalleske as a per diem nurse since April, 1990. In the year after her hiring, she worked on four occasions—each time for the same patient. More specifically, she worked 1.5 hours during each of the last two quarters of that year.[1] Dalleske is not a typical per diem nurse. She treats only those patients who have tracheostomies and, further, will work only if contacted by the patient's family or a Dacas supervisor. Dalleske's unusual status likely explains her omission from the telephone list and, indeed, most of the other nurses were unaware that Dalleske even worked for Dacas. Despite her co-workers' uncertainties, we do not un-

---

1. Two other per diem nurses—whose votes in the election went unchallenged—also worked substantially less than the 300–400 hour average during the last quarter. Janice Somora worked less than 20 hours and Nancy Colla less than 30 hours.

derstand the parties to dispute that Dalleske was and remains—at least in a technical sense—a per diem nurse at Dacas.

After stipulating to the bargaining unit, Dacas provided ONA with its initial *Excelsior* list containing the names and addresses of employees eligible to vote.[2] This list was incomplete and later amended. The amended list contained, for the first time, Dalleske as an eligible voter. ONA initially voiced a verbal objection to her inclusion in the bargaining unit and later, at the election, filed a formal challenge to Dalleske's ballot. Of approximately 30 eligible Dacas voters, 24 cast ballots with 12 in favor of the Union and 11 against. Dalleske's ballot remains unopened and, given the marginality of the Union's victory, her vote has the potential to affect the outcome.

Following the election, ONA filed objections to Dacas' pre-election conduct and, additionally, prosecuted the challenge to Dalleske's ballot. Dalleske, ONA argued, was only a casual employee who should not have been considered with the per diem nurses for voting purposes. A hearing on several of the objections and the challenged ballot was held on October 9–10, 1991. The hearing officer recommended that the NLRB sustain ONA's challenge to the ballot. In reaching her conclusion, the hearing officer opined that the parties' stipulated intent to include all per diem nurses in the bargaining unit, as applied to Dalleske, contravened the NLRB's policy against allowing casual employees to vote in union elections.[3]

The Board followed the hearing officer's recommendation and certified ONA as the collective bargaining representative for Dacas' nurses. Thereafter, Dacas refused to bargain with ONA, and the Union brought an unfair labor practice charge against the company. The Board granted summary judgment to the Union on June 24, 1992, and ordered Dacas to collectively bargain with

ONA. The instant petition for review and cross-application for enforcement followed.

## II. DISCUSSION

██ Our appellate review is clear and well-established: We will enforce the Board's order if its fact-finding and application of law to facts are supported by substantial evidence, unless the Board has premised its ruling upon an erroneous legal foundation. *See N.L.R.B. v. Pentre Electric, Inc.*, 998 F.2d 363, 368 (6th Cir.1993) (and cases cited therein). The framework within which we must decide the specific issue in this case, whether Dalleske's vote should be counted, is similarly well-settled:

> Ordinarily, when an issue is raised as to the Board's determination of an appropriate bargaining unit, our review is limited to ascertaining whether the Board abused its wide discretion, or acted capriciously in fixing such a unit.... However, when the parties stipulate an appropriate bargaining unit, the Board may not enter into an independent determination of a unit, but is bound by the stipulation.... In instances where the inclusion or exclusion of a particular employee within the stipulated unit violates some settled Board policy or statutory provision the Board may take these countervailing policies into account.... The Board will consider matters of practical significance only if the stipulation is ambiguous.... The primary concern in cases where there is a stipulated unit is the determination of the intention of the parties.

*N.L.R.B. v. Tennessee Packers, Inc., Frosty Morn Division*, 379 F.2d 172, 182 (6th Cir. 1967) (citations omitted). Accordingly, we analyze the parties' arguments under this essentially two-pronged approach.

### A. AMBIGUITY OF THE STIPULATION.

The terms of the stipulation are crystal clear: all per diem nurses are part of the

---

**2.** The name derives from the Board's decision in *Excelsior Underwear, Inc.*, 156 N.L.R.B. 1236 (1966). For a description of *Excelsior* lists and the *Excelsior Underwear* decision generally, *see* THEODORE KHEEL, 2 LABOR LAW at § 7A.04[3] (Matthew Bender 1989).

**3.** Interestingly, while pointing out at length the dissimilarities between Dalleske and her colleagues, the hearing officer held only that Dalleske was a casual employee, not that she held some title other than that of per diem nurse.

bargaining unit. It is equally clear to us, moreover, that Dalleske—in both technical and real senses—is a per diem nurse. The peculiarities of her employment notwithstanding, Dalleske shares much in common with her fellow per diem nurses. For example, she is paid the same hourly rate, accrues neither sick nor vacation days, and completes the same nursing charts following her patient visits. Granted she did not work very much, but neither did two other nurses who were allowed to vote in the election.

In addition, it is not as if the remaining per diem nurses comprise a homogeneous group. To the contrary, one nurse performs only difficult intravenous injections. Another, according to testimony at the evidentiary hearing, exclusively provides pediatric care. Yet a different per diem is willing to work only on Saturdays. Finally, of the approximately ten per diem nurses, at least three (including Dalleske) worked substantially less than the rest. Such heterogeneity is not surprising and, in fact, is to be expected. First, advances in medical technology have necessitated increased specialization within the nursing profession. Dacas' clients would be ill-served if its staff were unable to initiate difficult intravenous lines, treat patients with tracheostomies, and perform other specialized functions. Second, the idea behind per diem nurses, i.e., having them dictate their own work schedules and conditions, practically guarantees diversity. Thus, to the extent that the hearing officer's report can be read to mean that Dalleske is not a per diem nurse, that finding is not supported by substantial evidence.

. Having said this much, when we proceed to apply the stipulation in accordance with contract principles, as we must (see, e.g., N.L.R.B. v. Speedway Petroleum, 768 F.2d 151, 155 (7th Cir.1985) (and cases cited therein)), our inquiry would seem finished before it has begun. The Board, however, points us to evidence tending to indicate that the Union was unaware of Dalleske's employment with Dacas until after the stipulation was executed. From this, the Board argues, we should hold that the parties' minds did not meet as to whether Dalleske would be considered a per diem nurse for voting purposes. Assuming, for argument's sake, that the stipulation's clear terms permit us to consider such extrinsic evidence, we nevertheless reject the Board's contention.

Restated, the Board's argument is that, notwithstanding the stipulation's language to the contrary, the parties actually thought in terms of specific individuals rather than groups of employees. If the Union believed it knew of every potential voter, however, and yet still chose to use classes of nurses rather than individual employees, then this suggests that the court should leave the parties to the stipulation for which they have bargained. As we stated in *Tennessee Packers*: "If the parties had intended to include all truck drivers wherever located it would have been simple for the language to so indicate.... But the stipulation reads to the contrary." 379 F.2d at 182. While the decision in *Tennessee Packers*, as we discuss more fully below, resulted in the exclusion of certain challenged voters, its reasoning and straight-forward contract analysis apply with equal force here.

Our conclusion is strengthened, moreover, when considering that ONA had at its disposal the means for binding Dacas to a bargaining unit comprised of individuals rather than groups. Instead of settling upon the stipulation quoted from above, with its attendant *Excelsior* list, the Union could have asked for a *Norris–Thermador* agreement. See *Norris–Thermador Corp.*, 119 N.L.R.B. 1301 (1958); KHEEL, n. 2 *supra*, at § 7A.04[2]. Unlike an *Excelsior* list, which specifies eligible voters in accordance with the terms of a previously agreed upon stipulation, under a *Norris–Thermador* agreement, the employee list itself constitutes the stipulation. See *Speedway Petroleum*, 768 F.2d at 157 n. 6. Once executed, the agreement normally is dispositive of questions as to voter inclusion and preclusion.[4] *Id.*

---

**4.** Of course, the cost of entering into a *Norris–Thermador* agreement increases with the size of the employer. Thus, one would not expect General Motors and the United Auto Workers to haggle over the voting fate of an individual assembly line worker. In this case, however, the approximately 30 non-supervisory Dacas nurses

■ What we are left with is a case where ONA wants it both ways. After all, the Union, not Dacas, wanted per diem nurses to vote. Then, having achieved this concession from Dacas, the Union cried foul when it discovered a voting per diem nurse who was not on the telephone list. Naturally, ONA opposes Dalleske's vote when, without it, the Union has now gained a majority vote of 12 to 11 and when, with the vote counted, the result may possibly be different. As logical as this might seem from the Union's viewpoint, it is not a principled basis for objection especially when ONA did not challenge the ballots of per diem nurses Somora and Colla who had similarly weak ties to Dacas. *See* n. 1, *supra*. With these considerations in mind, and coupling the stipulation's facial clarity with the absence of any allegations of fraud or overreaching against Dacas, there is no reason to give the Union more than that for which it has bargained.

### B. POLICY CONSIDERATIONS.

■ Having concluded that the stipulation unambiguously requires that Dalleske's vote be counted, we can set that stipulation aside only if it violates either a federal statute or some settled NLRB policy. *Tennessee Packers*, 379 F.2d at 182.[5] In this regard, the hearing officer concluded:

> It is a long standing Board policy that those employees found to be casual employees are excluded from the bargaining unit as their infrequent, sporadic work history demonstrates a lack of community of interest with the other employees in the bargaining unit.

We have no qualm with the Board's determination that Dalleske is a casual employee within the meaning of that term. *See Sisters of Mercy Health Corp.*, 298 N.L.R.B. 483 (1990) (on-call nurses who worked less than an average of four hours per week during the preceding quarter were casual employees).

Nor do we quarrel with the Board's assertion that it has a policy precluding casual employees from voting in union elections. *See, e.g., Westchester Plastics of Ohio, Inc. v. N.L.R.B.*, 401 F.2d 903, 907 (6th Cir.1968) ("Casual employees who perform work at only intermittent periods have been excluded by the Board from the bargaining unit.")

However, no less than 5 circuits expressly, and another 2 impliedly, have rejected the NLRB's assertion that a community-of-interests type analysis can trump an unambiguous stipulation as to an appropriate bargaining unit. *See N.L.R.B. v. Speedway Petroleum*, 768 F.2d 151, 156 (7th Cir.1985); *N.L.R.B. v. Boston Beef Co., Inc.*, 652 F.2d 223, 226 (1st Cir.1981); *Methodist Home v. N.L.R.B.*, 596 F.2d 1173, 1176–77 (4th Cir.1979); *N.L.R.B. v. Mercy Hospitals of Sacramento, Inc.*, 589 F.2d 968, 973 (9th Cir.1978); *Tidewater Oil Co. v. N.L.R.B.*, 358 F.2d 363, 365–66 (2d Cir.1966). *Cf. Avecor, Inc. v. N.L.R.B.*, 931 F.2d 924, 933 (D.C.Cir.1991) (ALJ can consider NLRB doctrines "only insofar as the stipulation was ambiguous"); *Knapp–Sherrill Co. v. N.L.R.B.*, 488 F.2d 655, 659 (5th Cir.1974) (community-of-interests analysis properly applied absent "clear evidence of the parties' intention to apply some other test").

The only Sixth Circuit authority on this issue is *Tennessee Packers* itself. There, the union contended that the NLRB erred in counting the ballots of seven truck drivers because they allegedly were not within the stipulated bargaining unit. The stipulation covered "truck drivers at Tennessee Packers, Inc. Clarksville, Tennessee Plant." 379 F.2d at 181 (emphasis omitted). The seven challenged truck drivers lived in towns other than Clarksville. Tennessee Packers would routinely dispatch trucks to their cities, after which, the over-the-road drivers would sleep while the out-of-town truckers completed delivery routes. The Board found that the

---

do not present an employee roster sufficiently large so as to prevent effective negotiation.

**5.** One could read the earlier-quoted portion of the *Tennessee Packers* decision as prohibiting the NLRB from upsetting any unambiguous stipulation. While such an interpretation finds support in the opinion's text, courts generally have inter-

preted the decision as establishing two independent—yet sequential—principles. *See, e.g., N.L.R.B. v. Mercy Hospitals of Sacramento, Inc.*, 589 F.2d 968, 972 (9th Cir.1978); *but see Avecor, Inc. v. N.L.R.B.*, 931 F.2d 924, 933 (D.C.Cir. 1991) (ALJ can consider NLRB doctrines "only insofar as the stipulation was ambiguous").

parties did not intend to include the out-of-town truckers within the unit and that, in any event, they did not share a community of interests with the local truckers.

We held that the plain language of the stipulation established a geographical limitation including only those truckers at the Clarksville plant, and. that no Board policy was violated by such an agreement. *Tennessee Packers*, 379 F.2d at 182. Moreover, we continued, even if the stipulation was ambiguous, substantial evidence supported the Board's conclusion that the out-of-town truckers lacked a community of interests with the local ones. *Id.* Because the court agreed with the NLRB across the board, this case does not fairly stand for the proposition that community-of-interest considerations cannot trump an unambiguous stipulation, although one court believes it does. *See Mercy Hospitals of Sacramento*, 589 F.2d at 973.

Despite the lack of a firmly controlling precedent, the NLRB seems to realize the weakness of its legal position and, therefore, has attempted to characterize the "settled Board policy" in this case as the prohibition against casual employees voting rather than the community-of-interests principle. This argument is weak at best. Clearly, the community-of-interest test is the means by which the NLRB determines who is a casual employee, and the Board has been unable to cite any circuit-level authority to the contrary. Indeed, the NLRB's own hearing officer, in the above-quoted excerpt from her report, seems to recognize that the two considerations essentially are the same. Moreover, to the extent that the casual employee doctrine differs from the community-of-interests test, the differences have not been severe enough to cause the courts cited above to reconsider their decisions.

■ So considered, this case presents a clash between two well-principled tenets of labor law. In the first, courts leave parties to the agreements for which they have bargained in an effort to encourage full and free negotiation. In the second, courts disenfranchise from union elections those workers whose attachment to the bargaining unit is so attenuated that their inclusion would impinge upon the integrity of the voting bloc. When the two come together, courts uniformly have held the former to be of paramount importance. Finding these decisions sound, we extend the reasoning of *Tennessee Packers* and join our sister circuits in holding that the Board may not rely upon a worker's casual status or lack of a community of interests to disregard the terms of an unambiguous stipulation.

## III. CONCLUSION

To the extent that the Board's decision can be interpreted to mean that Dalleske was not a per diem nurse, this finding of fact is unsupported by substantial evidence. The NLRB's conclusion that the stipulation was ambiguous is premised upon an erroneous legal conclusion and, therefore, we set that ruling aside. Finally, the NLRB erred by holding that the casual nature of Dalleske's employment could trump the parties' clear intent to include all per diem nurses within the collective bargaining unit. Accordingly, we GRANT Dacas' petition for review, DENY the Board's cross-application for enforcement of its order, and REMAND the cause to the Board with instructions to DISMISS the administrative complaint.