2 F.3d 1162
 144 L.R.R.M. (BNA) 2057, 303 U.S.App.D.C. 193,
126 Lab.Cas. P 10,836
 DAVIS SUPERMARKETS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
United Food and Commercial Workers International Union,
Local Union 23, AFL-CIO-CLC, Intervenor.
 No. 92-1134.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 5, 1993.
Decided Aug. 27, 1993.
 
 Stuart A. Williams argued the cause for petitioner.
 David A. Fleischer, Sr. Atty., N.L.R.B., argued the cause for respondent. With him on the brief were Jerry Hunter, Gen. Counsel and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B. Howard E. Perlstein also entered an appearance for respondent.
 James R. Reehl filed the brief for intervenor United Food and Commercial Workers Intern. Union, Local Union 23, AFL-CIO-CLC. Peter J. Ford also entered an appearance for intervenor.
 Before MIKVA, Chief Judge; EDWARDS and BUCKLEY, Circuit Judges.
 Opinion for the Court filed by Chief Judge MIKVA.
 MIKVA, Chief Judge:
 
 
 1
 This multifarious case concerns the alleged efforts by Davis Supermarkets, Inc., ("the Company") to combat an organizing campaign by the United Food and Commercial Workers International Union, Local Union 23, AFL-CIO-CLC ("Local 23") in the Company's Hempfield, Pennsylvania store in 1986. The National Labor Relations Board ("the NLRB" or "the Board") found that the Company had committed numerous unfair labor practices prohibited by sections 8(a)(1), 8(a)(2), and 8(a)(3) of the National Labor Relations Act ("the NLRA" or "the Act"). 29 U.S.C. Sec. 158(a)(1)-(3). The Board issued a bargaining order to remedy the unfair labor practices and protect the majority sentiment previously expressed by the employees through authorization cards. 306 N.L.R.B. No. 86, 1992 WL 41351 (1992).
 
 
 2
 The Company challenges numerous aspects of the Board's decision and order, including many of the findings of unfair labor practices and the issuance of the bargaining order itself. We find that as to each of these challenges the Board's order is completely supported by the facts and is based on the proper application of federal labor law. We therefore uphold the Board's order in all respects.
 
 I. BACKGROUND
 
 3
 We will briefly summarize the main facts of the case and will relate additional facts as it becomes necessary to do so in analyzing the numerous issues we are asked to review. As will become apparent, our decision is largely fact-driven, as were the Board's determinations.
 
 
 4
 Davis Supermarkets, a family-owned corporation engaged in the retail grocery business, owns and operates a supermarket in Greensburg, Pennsylvania, and a supermarket in Hempfield Township, Pennsylvania. The Greensburg store has been open for approximately thirty years. The United Steelworkers of America ("Steelworkers") has represented the Greensburg employees throughout the period relevant to this case. The Hempfield store opened in 1984. When the events giving rise to this case commenced in 1986, the Hempfield employees were unrepresented.
 
 
 5
 In March 1986, Local 23 launched a concerted organizing campaign in the Hempfield store, which employed more than one hundred men and women. Over the next few months, Donald Porter, an organizer for Local 23, met with various employees on and off the store's premises, urging them to sign authorization cards for Local 23. Some of the employees that he successfully recruited solicited authorization cards from other employees.
 
 
 6
 By April 19, 1986, a total of thirteen employees had signed authorization cards for Local 23. On that day, the Company summarily laid off eight workers, six of whom had signed authorization cards: Debra Defibaugh, Charlene Garris, Lance Good, Jennifer Hilty, Sharlene Shotts, and Sonja Welsh. In May, the Company fired or constructively fired two other employees who had signed cards, Larry Miller and Charles Miscovich. In July, the Company constructively discharged Linda Kunkle, who had also signed a card for Local 23.
 
 
 7
 On May 1, at two separate meetings with various employees of the Hempfield store, Bob Davis, the chairman of the Company's board of directors, told the assembled workers that he wanted them to sign authorization cards for the Steelworkers. After one of the meetings, a Steelworkers representative from the Greensburg store and an official of that union handed out Steelworkers contracts and authorization cards to the employees. Following the other meeting, two Steelworkers representatives from the Greensburg facility distributed Steelworkers contracts and cards.
 
 
 8
 Despite the Company's anti-Local 23 actions, Local 23 concluded that it had attained majority support among the Hempfield store's employees and issued a continuing request for bargaining on May 13, 1986. By May 24, 58 out of 109 employees had signed authorization cards for Local 23, and Local 23 had therefore actually achieved majority status. An election was scheduled for July 25. On July 22, however, Local 23, fearing a loss of support, requested cancellation of the election. This request was granted.
 
 
 9
 Meanwhile, a dispute raged between the Company and Local 23 pickets who were marching on the premises of the Hempfield store to protest unfair labor practices. On May 23, the Company filed a civil trespass suit in state court against the pickets and, on May 28, acquired an injunction enjoining them from entering the store grounds and limiting them to three pickets at each parking lot entrance. On June 2, Local 23 filed a charge with the Board, alleging that the Company had unlawfully prevented them from picketing in the parking lot. On July 25, the NLRB's General Counsel issued a complaint alleging that the Company had violated section 8(a)(1) by denying Local 23 access to the premises and by maintaining the civil trespass suit.
 
 
 10
 In late July, Local 23 resumed picketing, and some pickets distributed handbills to customers in the parking lot. The Company threatened them with arrest and, on August 2, a sheriff's deputy presented the pickets with a document indicating that they were not allowed in the parking lot. In late November, a number of laid-off employees of the Hempfield store resumed picketing on the sidewalk in front of the facility. The Company, despite the issuance of the General Counsel's complaint, obtained a court order from the state court requiring Local 23 and the pickets to show cause why they should not be held in contempt for violating the terms of the May 28 injunction.
 
 
 11
 Overall, between June 1986 and December 1987, the General Counsel filed four complaints that collectively alleged that the Company had, by its conduct at the Hempfield facility, committed numerous unfair labor practices in violation of NLRA sections 8(a)(1), 8(a)(2), 8(a)(3), and 8(a)(5). On March 28, 1990, an Administrative Law Judge ("ALJ") found that the Company had violated these sections by, among other actions: (1) firing or constructively firing nine employees for the purpose of discouraging union activity; (2) urging employees to join the Steelworkers and permitting only that union to solicit employees in the Company's store; (3) refusing to allow Local 23 to picket or handbill on its property while allowing other organizations access to the store's premises; and (4) continuing a state trespass suit after the General Counsel had issued a complaint with respect to the denial of access to the Company's property. In addition, the ALJ found that a bargaining order was necessary to remedy the unfair labor practices and protect the majority sentiment previously expressed through authorization cards.
 
 
 12
 On February 27, 1992, the Board affirmed the ALJ's decision in all major respects, with only slight modifications to the ALJ's findings. 306 N.L.R.B. No. 86, 1992 WL 41351. The Board's order requires the Company to cease and desist from the unfair labor practices it is found to have committed and prohibits the Company from otherwise violating the employees' self-organization and collective bargaining rights. In addition, the order requires the Company, among other things, to offer the nine improperly discharged employees reinstatement; to make them whole for any loss of pay or seniority; to make Local 23 whole for legal expenses; and, on request, to bargain with Local 23 as the exclusive representative of the employees at the Hempfield store.
 
 
 13
 The Company challenges the findings of unfair labor practices as to the nine firings, the aiding of the Steelworkers at the Hempfield facility, the discriminatory denial of access to the pickets, and the maintenance of the state trespass suit after the General Counsel issued his complaint. It also asserts that there is not a sufficient basis for a bargaining order.
 
 
 14
 II. LAYOFF OF SIX EMPLOYEES ON APRIL 19, 1986
 
 
 15
 The Board found the April 19 layoffs of Debra Defibaugh, Charlene Garris, Lance Good, Jennifer Hilty, Sharlene Shotts, and Sonja Welsh to be violations of sections 8(a)(1) and 8(a)(3) of the Act. Section 8(a)(1) states, "It shall be an unfair labor practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the [self-organization and collective bargaining] rights guaranteed in section 157 of this title." 29 U.S.C. Sec. 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. Sec. 158(a)(3).
 
 
 16
 In assessing discriminatory discharge cases, we are required to use an approach known as the Wright Line test (after Wright Line, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)). Under this approach, "[w]here a termination is alleged to be improper, the NLRB General Counsel bears the burden of demonstrating that 'an antiunion animus contributed to the employer's decision to discharge an employee.' " Avecor, Inc. v. NLRB, 931 F.2d 924, 928 (D.C.Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992) (quoting NLRB v. Transportation Management Corp., 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983)). If the General Counsel makes this prima facie showing, the employer can nonetheless avoid an unfair labor practice finding by showing "by a preponderance of evidence that the worker would have been fired even if he had not been involved with the union." Transportation Management, 462 U.S. at 395, 103 S.Ct. at 2471.
 
 
 17
 The Company alleges that it fired the six employees for a variety of valid reasons, including "attitude problems" (Good, Hilty), poor performance (Defibaugh, Garris, Welsh), and consolidation in response to slow business (Defibaugh, Garris, Shotts). The Board did not find these explanations believable, in light of the shifting reasons offered for the dismissals, the lack of evidence of performance and attitude problems, the absence of prior warnings to the employees supposedly fired for such problems, and the quick replacement of the workers allegedly laid off for economic reasons with employees from the Greensburg store. The Board found instead that the firings were part of a strategy to suppress Local 23's organizing campaign.
 
 
 18
 The Company contends that the Board lacked substantial evidence to find that "antiunion animus" was the actual motivation for the firings. To satisfy this requirement, the General Counsel generally must establish that the employer knew that the workers it laid off were involved in union activities. The Company maintains that on April 19, it was unaware of the union activities of any of the six employees, and that the General Counsel failed to show otherwise.
 
 
 19
 Despite the Company's assertions, there is considerable direct evidence that it knew of or suspected the pro-union sympathies of at least some of the workers. For example, about a year before she was fired, Shotts asked two managers about getting a union in the store, and the managers warned her not to talk about it any further. Also, on March 25, 1986, Welsh's immediate supervisor interrogated her about a Local 23 meeting that she had attended. As for the other employees, however, there is, as the Company maintains, scant direct evidence that the Company was aware they were union supporters when it discharged them.
 
 
 20
 The lack of direct evidence does not, however, necessarily render the Board's findings of anti-union motivation inadequate. The Board found substantial circumstantial evidence that the Company knew of the employees' union activities, and "[a]lthough the Board may not base its decision on mere conjecture, the element of knowledge may be shown by circumstantial evidence from which a reasonable inference may be drawn." Abbey's Transp. Services, Inc. v. NLRB, 837 F.2d 575, 579 (2d Cir.1988). "Similarly, the Board may infer discriminatory motive from circumstantial evidence." Id. Among the factors on which the Board may base such inferences are "the timing of the discharges in relation to the union activity [and] the simultaneous nature of otherwise unconnected dismissals." Id. at 580.
 
 
 21
 Both the timing and the nature of the discharges in this case suggest anti-union motivations. The firings occurred just as Local 23's campaign was picking up steam, and the employees, who worked in various different departments, were all dismissed on the same day for entirely disparate reasons. Furthermore, of the eight employees laid off, six were union supporters, and this occurred at a time when only thirteen out of more than one hundred employees had signed cards. Cf. NLRB v. Camco, Inc., 340 F.2d 803, 810 (5th Cir.1965) (holding that knowledge of union activities could be inferred from the fact that an employer discharged eleven of sixteen union adherents without discharging any of its remaining seventy-four employees); see also Brief for NLRB at 40 (relying on Camco). In light of the summary and targeted nature of the dismissals and the Company's failure to come up with plausible legitimate reasons for them, there was probably sufficient evidence to find that the six firings were violations of the Act.
 
 
 22
 Nonetheless, there is a somewhat troubling lack of evidence that the Company even had the opportunity to learn of the union advocacy of several of the fired workers. Hilty and Garris, in particular, seem to have performed very few union-related actions on store premises within the sight of other people.
 
 
 23
 There is, however, an alternative and less problematic manner in which to assess the legality of these six layoffs. Although the General Counsel ordinarily must show that the employer was aware of the pro-union sentiments of a dismissed employee in order to establish an 8(a)(3) violation, he does not have to make such a showing if the dismissal is part of a mass layoff "for the purpose of discouraging union activity." Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1180 (6th Cir.1985). As the Sixth Circuit has explained:
 
 
 24
 The focus of the theory is upon the employer's motive in ordering extensive lay-offs rather than upon the anti-union or pro-union status of particular employees. The rationale underlying this theory is that general retaliation by an employer against the workforce can discourage the exercise of section 7 [self-organization and collective bargaining] rights just as effectively as adverse action taken against only known union supporters.
 
 
 25
 Id. at 1180.
 
 
 26
 In other words, it is not necessary to establish the Company's awareness of each discharged worker's union advocacy, so long as the firing was part of a mass layoff. The NLRB, in upholding the ALJ's findings, relied on a mass discharge theory:
 
 
 27
 The Respondent excepts to the judge's finding that the Company had knowledge of the employees' union activity. In agreeing with the judge's finding that the discharges were part of a scheme to thwart the employees' organizing drive, we also rely on ACTIV Industries, 277 NLRB 356 fn. 3, 1985 WL 46074 (1985), in which the Board stated, "[W]e emphasize that it is the Respondent's mass discharge, and not its selection of employees for discharge, that is unlawful. Accordingly, the General Counsel was not required to show a correlation between each employee's union activity and his or her discharge.... Instead, the General Counsel's burden was to establish that the mass discharge was ordered to discourage union activity or in retaliation for the protected activity of some."
 
 
 28
 306 N.L.R.B. No. 86 at 2, 1992 WL 41351.
 
 
 29
 The Board's finding of an unlawful mass layoff is clearly supported by substantial evidence. A supervisor told Defibaugh on April 19, the day of the firings, that "they heard the union was getting close to the number they needed for an election and they were getting rid of the troublemakers and the people with attitude problems."
 
 
 30
 Nonetheless, the Company attacks the Board's reliance on the mass discharge theory, claiming that it was deprived of a full and fair hearing because the theory was neither raised in the complaint nor litigated before the Board. We are not persuaded by this argument. The Board's Rules and Regulations require only that the complaint include "a clear and concise description of the acts which are claimed to constitute unfair labor practices," not that it include the legal theory relied on. 29 C.F.R. 102.15. Nor does "[t]he due process clause ... require a precise statement of the theory upon which the General Counsel intends to proceed under the Act, with the threat that failure of precision in pleading will require the General Counsel to re-try the case." Pergament United Sales, Inc. v. NLRB, 920 F.2d 130, 136 (2nd Cir.1990).
 
 
 31
 Although the General Counsel's complaint did not specifically mention the mass discharge theory, it clearly referred to the conduct constituting an unlawful mass layoff when it charged that "Respondent engaged in the [dismissals] ... in order to discourage employees from engaging in [pro-Local 23] activities or other concerted activities for the purpose of collective bargaining or other mutual aid or protection." [DA 138-39]. The complaint was therefore adequate to raise the mass discharge issue.
 
 
 32
 The General Counsel provided the Company with adequate notice of the mass layoff issue, not only in the complaint, but also in the hearing itself. Before the ALJ, the General Counsel explicitly contended that the firings were part of an overall scheme to thwart Local 23's organizing drive by getting rid of "troublemakers and people with attitude problems." This argument clearly raised the mass discharge theory. The Company consequently had a full and fair opportunity to litigate the matter.
 
 
 33
 In any event, the Company would not have been prejudiced by the alleged omission of the mass layoff theory from the complaint and the hearing because there is no significant defense to the mass layoff charge that the Company did not raise anyway in defending the individual dismissals. When an employer is not prejudiced by the Board's reliance on a theory not specifically addressed in the complaint or at the hearing, the employer's due process rights are not violated. See Pergament, 920 F.2d at 137.
 
 
 34
 We thus hold that the first part of the Wright Line test, requiring a showing that firings were motivated by anti-union animus, is satisfied under the mass discharge theory. According to the second part of the test, the employer can overcome the showing of anti-union motivation only by establishing, by a preponderance of the evidence, that "the discharge would have occurred in any event and for valid reasons." NLRB v. Transportation Management Corp., 462 U.S. at 398, 103 S.Ct. at 2473.
 
 
 35
 The Board properly found that the Company failed to meet this burden. As we noted above, supra p. 1167, the Company proffered allegedly valid reasons why each of the six employees was fired on April 19. The Board confidently rejected all of these explanations as inconsistent and implausible. "Under [the substantial evidence standard of 5 U.S.C. Sec. 706(2)(E) ], our function is to determine only whether the agency could fairly and reasonably find the facts as it did." Throckmorton v. National Transp. Safety Bd., 963 F.2d 441, 444 (D.C.Cir.1992) (citations omitted). Because the Board's findings were clearly reasonable, we see no basis for overturning its conclusions. We therefore uphold the Board's determination that the six April 19 layoffs constituted unfair labor practices in violation of sections 8(a)(1) and 8(a)(3) of the Act.
 
 
 36
 III. LAYOFF OF THREE EMPLOYEES AFTER APRIL 19, 1986
 
 
 37
 In addition to the six April 19 firings, the Board also found three discharges or constructive discharges that occurred in later months to be violations of sections 8(a)(1) and 8(a)(3). Because the dismissals of Larry Miller, Charles Miscovich, and Linda Kunkle occurred on three different dates ranging from May to July, the mass discharge theory does not apply. In order to establish anti-union animus, the General Counsel was therefore required to establish that the Company was aware that each of the three employees supported Local 23.
 
 
 38
 We find that there is substantial evidence that the Company knew of the pro-union activities of these three workers. We also uphold the Board's conclusion that the firings were motivated only by anti-union animus. Perhaps the strength of the Board's position explains why, in its brief, the Company devotes all of three sentences to challenging these unfair labor practice findings.
 
 A. Larry Miller
 
 39
 Miller was discharged on May 14, 1986. The Company alleges that it fired Miller, a bagger and stockboy, because, while on break, he ate food that he had stolen from the store. The Board found, however, that the store manager who fired Miller never even asked him whether he had paid for the items. Moreover, neither of the two employees with whom Miller had been eating were similarly discharged. In light of the fact that Miller repeatedly spoke to Porter, Local 23's organizer, in the parking lot of the Hempfield store, and that the store manager once told Porter to leave Miller alone, there is substantial evidence that the Company knew of Miller's support of Local 23 and fired him for this reason.
 
 B. Charles Miscovich
 
 40
 Miscovich worked a day shift at the Hempfield store because he also had a night job at a gas station. In mid-May, shortly after Miscovich signed a Local 23 authorization card, the store manager began scheduling him for night shifts. When Miscovich reminded the manager of his situation, he responded that Miscovich had to work when told to or not work at all. After that, Miscovich was never able to work at the store again.
 
 
 41
 There is no doubt that the Company was aware of Miscovich's pro-union stance, for he was called to a May 12 meeting where Bob Davis, the chairman of the Company, told the assembled workers that he knew they had all signed authorization cards. There is substantial evidence to support the Board's conclusion that the Company constructively discharged Miscovich in violation of sections 8(a)(1) and 8(a)(3).
 
 C. Linda Kunkle
 
 42
 On July 26, Kunkle quit her job, after suffering through three weeks of inexcusable treatment. The Company transferred her from an office job to the meat department, reduced her hours, required her to stay in a back room and wrap meat, and forbade other employees to talk to her about anything except meat.
 
 
 43
 There is no doubt that the Company was aware of Kunkle's pro-union activities. Kunkle was an active and public Local 23 supporter who had signed an authorization card, solicited cards from other employees, and picketed the store to protest its unfair labor practices. The Company apparently photographed her picketing. Moreover, she was one of the employees present at the May 12 meeting where Bob Davis told the assembled workers that he knew they had all signed authorization cards. We uphold the Board's finding that Kunkle was unlawfully constructively discharged.
 
 IV. THE BARGAINING ORDER
 
 44
 The Company asks us to vacate the Board's bargaining order. Under the Supreme Court's decision in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), there are two categories of cases in which the Board may issue a bargaining order: "exceptional cases marked by outrageous and pervasive unfair labor practices" ("Category I") and "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process" ("Category II"). Id. at 613-14, 89 S.Ct. at 1940.
 
 
 45
 In Category II cases, before we will enforce a bargaining order, we must find that substantial evidence supports three conclusions: (1) at some time, the union had majority support within the bargaining unit; (2) the employer's unfair labor practices have had the tendency to undermine majority strength and impede the election process; and (3) the possibility of erasing the effects of past unfair labor practices and of ensuring a fair rerun election by the use of traditional remedies is slight, and the once-expressed sentiment in favor of the union would be better protected by a bargaining order. St. Francis Fed'n of Nurses & Health Professionals v. NLRB, 729 F.2d 844, 854-55 (D.C.Cir.1984).
 
 
 46
 Our cases employ this three-part test only in Category II situations, however. See Avecor, 931 F.2d at 934. Local 23, intervening in this appeal, argues that this case belongs in Category I and that the three prerequisites therefore do not apply.
 
 
 47
 There is no need to decide whether this case falls within Category I or Category II. The case clearly satisfies the three-part inquiry applied to Category II cases. Since it meets this greater burden, it is not necessary for us to designate the case as belonging in one category or the other.
 
 A. Local 23's majority status
 
 48
 In issuing the bargaining order, the NLRB concluded that on May 24, 1986, there were 109 employees in the Hempfield bargaining unit, and that 58 of those employees, a majority, had formally expressed support for Local 23. The Board declined to address the unit placement of six additional employees because their placement in the Hempfield unit mathematically could not affect Local 23's majority status. 306 N.L.R.B. No. 86 at 7 n. 11, 1992 WL 41351.
 
 
 49
 The Company asserts that the Board erred in making these calculations by wrongly excluding some workers from the bargaining unit and wrongly including others. It maintains that if the Board had properly placed each of the employees, the margin of support for Local 23 would have been smaller, and the status of the six employees whom the Board did not consider would have been dispositive. We reject the Company's claims and hold that the Board correctly determined the composition of the bargaining unit as of May 24. Local 23 unquestionably enjoyed majority support on that day.
 
 
 50
 1. The exclusion of eleven dual-location employees
 
 
 51
 In the midst of Local 23's organizing campaign, the Company began to bring workers from its Greensburg store to perform the same jobs in Hempfield on a part-time or temporary basis. The Company contests the Board's decision to exclude from the Hempfield bargaining unit eleven such workers who were members of the Steelworkers, the bargaining representative of the Greensburg employees.
 
 
 52
 The Company and Local 23 stipulated at the representation hearing on June 3, 1986, that "those persons who have been transferred to the Hempfield location from the Greensburg location are permanent employees, employed in the unit, eligible to vote in the election." The Company argues that the stipulation encompasses the eleven disputed employees and that the Board should therefore have included them within the Hempfield bargaining unit.
 
 
 53
 The Board does not dispute that the stipulation is binding, but it asserts that it does not cover the eleven employees in question. We find that the Board's interpretation of the scope of this stipulation is a reasonable one. Nine of the eleven employees were not truly "transferred," for they continued to spend much of their time working at Greensburg. The two others, Neil Vario and John Shumaker, were in fact transferred and worked at the Hempfield store for a time. Both men were, however, told at the time of their transfers, and repeatedly thereafter, that their reassignments were only temporary and that they would be returned to Greensburg as soon as possible. (Vario returned to Greensburg after four months, and Shumaker returned after about a year). In light of the clearly temporary character of their transfers, Vario and Shumaker could not properly be deemed "permanent employees" of the Hempfield store within the meaning of the stipulation.
 
 
 54
 The Company maintains, however, that the eleven employees should have been included in the Hempfield unit whether or not the stipulation applied to them. It argues that the workers shared a sufficient "community of interest" with the other Hempfield employees to be included in the Hempfield bargaining unit. The Board, however, found that most of the workers in question spent the majority of their hours in the Greensburg facility and remained under the primary supervision of the Greensburg store supervisors. It thus held that they did not share an adequate community of interest with the Hempfield unit.
 
 
 55
 More importantly, all eleven workers were represented by the Steelworkers throughout the period they worked at the Greensburg store. The Board stressed that it would be incongruous for them to be represented simultaneously by the Steelworkers and Local 23. We agree. In Bentson Contracting Co. v. NLRB, this Court, reviewing the Board's placement of employees who performed two different categories of work for the same employer into two different bargaining units, stated, "Two unions ... simply cannot be the 'exclusive' bargaining representative of the same employee with respect to the same conditions of employment." 941 F.2d 1262, 1266 (D.C.Cir.1991). We observed:
 
 
 56
 If such an employee had a grievance regarding work breaks, sick pay, vacations, insurance, work assignments or any other general conditions of employment, it is unclear which union should represent him. The employer would constantly face the threat of breaking the law by bargaining with the wrong representative. In addition, there would be significant burdens on the combination employees: they would have to join two unions, pay dues twice, attend two sets of meetings, and somehow split their allegiance....
 
 
 57
 Id. at 1266.
 
 
 58
 The eleven dual employees in this case would face these aptly-described issues if they were placed in the Hempfield unit in addition to the Greensburg unit. Would the Steelworkers or Local 23 represent them in disputes over vacation time and insurance, not to mention over work assignments and transfer policy? Because the workers' primary community of interest was with the Greensburg unit, and because they were all members of the Steelworkers, the representative of that unit, we uphold the Board's decision to exclude them from the Hempfield unit.
 
 
 59
 2. The inclusion of three office clerical employees
 
 
 60
 In exchange for Local 23's stipulation not to challenge the inclusion of employees permanently transferred from Greensburg to Hempfield, the Company stipulated that three office clerical employees were included in the Hempfield unit. The Company now attempts to renege, suggesting that it is unfair to hold the Company to its stipulation when Local 23 was not bound to the stipulation regarding transfers. The Company contends that it should have been given the opportunity to establish that the office clerical workers lacked a sufficient community of interest with other Hempfield employees to be included in the Hempfield bargaining unit.
 
 
 61
 We can discern no reason why the Company should not be held to its stipulation as to these three employees. The Board did not fail to enforce Local 23's stipulation regarding the transferred employees; it simply failed to interpret the stipulation in the manner the Company would have preferred. On the other hand, there is no confusion concerning the meaning of the Company's stipulation that "there is no basis for excluding any employee on the basis of their being an office clerical employee." As we have held, "If the terms of the stipulation are unambiguous, the Board must hold the parties to its text." Avecor, Inc. v. NLRB, 931 F.2d 924, 932 (D.C.Cir.1991). The Board properly applied the Company's stipulation, and we therefore uphold the inclusion of the three office clerical employees.
 
 
 62
 3. The inclusion of Defibaugh as a non-supervisor
 
 
 63
 The Company challenges the Board's conclusion that Debra Defibaugh was not a supervisor and was therefore eligible for the Hempfield bargaining unit.
 
 
 64
 The Board found that although she had the title of "manager" of the bakery, and although she had some scheduling responsibilities, Defibaugh otherwise performed the same work as other bakery employees. She had no effective authority to recommend decisions regarding hiring, transferring, suspending, laying off, recalling, promoting, discharging, assigning, rewarding, or disciplining other workers. Because of her lack of supervisory duties, the Board concluded that Defibaugh was not a supervisor within the meaning of the Act.
 
 
 65
 This Court has held that the Board must be granted a large measure of discretion in determining whether an employee satisfies the definition of a "supervisor" in section 2(11) of the Act. Clark & Wilkins Indus., Inc. v. NLRB, 887 F.2d 308, 312-13 n. 9 (D.C.Cir.1989), cert. denied 495 U.S. 934, 110 S.Ct. 2177, 109 L.Ed.2d 505 (1990). In this case, the Board reasonably determined, in light of substantial evidence, that Defibaugh did not perform the duties of a supervisor under the NLRA. We find no reason to reverse the Board's well-articulated judgment.
 
 
 66
 4. The exclusion of five college students and Tim Sheridan
 
 
 67
 The Board excluded five college students and a bagger named Tim Sheridan from the unit because they worked primarily during summer vacation and holiday periods. Their employment during other periods was, according to the Board, "sporadic and intermittent, at best." 306 N.L.R.B. No. 86 at 7-8, 1992 WL 41351. The Company claims that these six employees shared a sufficient community of interest with the other employees in the Hempfield unit to be included in the unit.
 
 
 68
 The NLRB excludes from bargaining units students who work during the summer unless they continue to work on a regular part-time basis after returning to school. Crest Wine and Spirits, Ltd., 168 NLRB 754 (1967). The Board found that none of the students met this requirement. As for Tim Sheridan, whether or not he was actually a student (the record is unclear on this point), his working calendar mirrored that of the college students almost exactly. The Board was therefore justified in excluding him from the unit for the same reasons it excludes students who work only during summers and vacation periods.
 
 
 69
 5. The inclusion of nine discharged employees
 
 
 70
 The Board included within the Hempfield unit the nine employees who were dismissed in violation of sections 8(a)(1) and 8(a)(3). See supra, pp. 1167-71. The Company contends that because the nine workers were lawfully discharged for valid reasons, their authorization cards should not have been counted in calculating Local 23's majority status as of May 24.
 
 
 71
 As we explained above, however, the firings were in fact illegal. Consequently, the Board properly included the nine workers in the unit. Linda Kunkle did not leave her job until July, so the Board properly included her in the unit as of May 24 in any event.
 
 
 72
 6. The Board's failure to reach the status of six employees
 
 
 73
 In upholding the ALJ's finding of Local 23's majority status, the Board found it "unnecessary to determine the unit placement of the five Greensburg employees [working part-time at Hempfield] who were not Steelworkers members." 306 N.L.R.B. No. 86 at 7 n. 11, 1992 WL 41351. The Board also declined to address the proper placement of Thomas Howard, a frozen food manager who may have been a supervisor and who arguably did not share a community of interests with the Hempfield bargaining unit. The Company requests that we remand so that the Board can determine the status of these six workers.
 
 
 74
 The Board found it unnecessary to consider these employees because, "[E]ven assuming that these six individuals should be included in the unit, the Union still would have represented a majority on May 24." Id. We have found that the Board did not improperly include or exclude any workers from the Hempfield bargaining unit. Consequently, the Board's calculation that it was not essential to determine the status of these six workers remains valid. We therefore uphold the Board's finding that Local 23 enjoyed the support of a majority of the Hempfield unit on May 24, 1986.
 
 
 75
 We do, however, remand for the Board to determine the unit placement of any of the six individuals who are still employed at the Hempfield store. As we observed in Avecor, "[their] status may not affect the union's card majority, but it will determine [their] potential for membership in the union." 931 F.2d at 933. We stress, however, that this remand does not affect the validity of the bargaining order and should not in any way delay the ultimate resolution of this long, drawn-out bargaining dispute.
 
 
 76
 B. The other requirements for a bargaining order
 
 
 77
 As we noted above, supra p. 1171, in order to implement a Gissel-type bargaining order in a Category II case, the NLRB must not only find that Local 23 had majority support, but also that the unfair labor practices tended to undermine the majority support and that traditional remedies would not suffice to ameliorate the situation. The Company urges us to overrule the Board's findings that these prerequisites were satisfied in the present case.
 
 1. Waiver
 
 78
 The Board contends that the Company did not challenge the bargaining order on these grounds below and therefore waived the argument under section 10(e) of the Act. That section provides, "No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. Sec. 160(e).
 
 
 79
 The Board's waiver argument fails. In the Company's exceptions to the ALJ's proposed decision, it specifically objected to the ALJ's finding that the Company "engag[ed] in a course of unlawful conduct which undermined [Local 23's] majority status and prevented the holding of a fair election." [D.A. 119]. It also stated an exception to the ALJ's finding that "a bargaining order is necessary and appropriate to protect the majority sentiment expressed through authorization cards and otherwise to remedy the violations committed." [D.A. 118]. These exceptions clearly constitute challenges to the Board's conclusion that the second and third parts of the three-part Gissel test were satisfied.
 
 
 80
 Although the Company did not raise these arguments again before the Board, articulating them in its exceptions to the ALJ's decision was adequate to satisfy section 10(e) of the Act. As this Court has held, "Although briefing and argument before the Board are desirable ... section 10(e) does not require such procedures...." Local 900, Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO v. NLRB, 727 F.2d 1184, 1192 (D.C.Cir.1984). The critical inquiry is whether "the Board was ... given notice of the parties' objections to the Board's solutions...." Id. The Board unquestionably was given such notice in the present case. The Company therefore did not waive its right to challenge in this Court the Board's findings regarding the impact of the unfair labor practices and the necessity of a bargaining order.
 
 
 81
 2. Tendency of unfair labor practices to undermine union support
 
 
 82
 The Company's claims fail on the merits, however. First of all, we see no fault with the Board's finding that the Company's unlawful activities "undermined the Union's majority status."
 
 
 83
 In contesting this finding, the Company asserts that the unfair labor practices could not have caused Local 23 to lose majority strength because most of the illegal conduct took place before Local 23 reached majority status on May 24. There are several problems with this argument. First of all, although the Company initiated the majority of the unfair labor practices before May 24, much transpired after that date that may have intimidated Hempfield employees who were considering supporting Local 23. For example, the Company failed to recall Shotts, although her supervisor had told her she would be recalled. The store manager continued to schedule Miscovich only for the evening shift and then ceased scheduling him at all. He also removed Linda Kunkle from her office job and sentenced her to silent labor in the meat department. Moreover, the Company continued to prosecute its trespass suit against the Local 23 pickets and acquired a court order limiting their access to the store premises. (We determine below, infra pp. 1179-80, that the maintenance of this lawsuit was unlawful). These unfair labor practices alone may have provided a sufficient basis for the Board's conclusion that the Company's conduct undermined support for Local 23.
 
 
 84
 The post-May 24 actions do not stand alone, however. The Company is simply wrong when it asserts that the Board should not have considered the numerous unfair labor practices that occurred before Local 23 reached majority status. The Third Circuit has "rejected the contention that unfair labor practices which occur before the achievement of union majority [cannot] be relied upon by the Board in issuing a bargaining order." United Oil Mfg. Co. v. NLRB, 672 F.2d 1208, 1212 (3d Cir.), cert. denied, 459 U.S. 1036, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982) (citing NLRB v. Permanent Label Corp., 657 F.2d 512, 519 (3d Cir.1981), cert. denied, 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982) (en banc)). We agree with the Third Circuit, for, as that Court has sensibly noted, "[f]orbidding the Board from considering such conduct sets an artificial time barrier and ignores the possible cumulative effect of antiunion activity." Permanent Label, 657 F.2d at 519.
 
 
 85
 Moreover, it is important to consider that many of the employees who were intimidated against supporting Local 23 in May, when it achieved a bare majority, were likely still intimidated in July, when it lost its majority status. In other words, the earlier unfair labor practices deterred some employees from ever supporting the union. It would be nonsensical to prevent the Board from considering the impact of the earlier unlawful conduct, for it directly affected the tally when Local 23 lost majority support.
 
 
 86
 In sum, there is substantial evidence that the Company's illegal actions had an extremely damaging effect on Local 23's organizing campaign and contributed to its loss of majority status. We therefore uphold the Board's finding that the second prerequisite for a Gissel bargaining order was satisfied.
 
 3. The need for a bargaining order
 
 87
 We see even less reason to disturb the Board's finding as to the third prerequisite--that, due to the employer's serious and pervasive unfair labor practices, the possibility of ensuring a fair election is slight and employee sentiment would, on balance, be better protected by a bargaining order. We generally defer to the NLRB's expertise regarding this requirement, for, as we have noted, it "is a determination largely within the special competence of the Board." Road Sprinkler Fitters Local Union v. NLRB, 681 F.2d 11, 24 (D.C.Cir.1982), cert. denied, 459 U.S. 1178, 103 S.Ct. 831, 74 L.Ed.2d 1025 (1983).
 
 
 88
 The ALJ explained cogently, and in some detail, why he believed, "[i]n view of the degree and pervasiveness of the unfair labor practices, [that] the holding of a fair election is no longer possible." He noted the large number of unfair labor practices, how they were committed by some of the top officials in the company, and how they were directed at numerous employees. He also observed how the Company's conduct instilled "a strong fear of union representation" in the employees. The Board affirmed the ALJ's conclusions. Although it failed to take into account the effect of any employee turnover, as required by Avecor, 931 F.2d at 937 ("before issuing a category II bargaining order, the Board must carefully consider employee turnover"), the Company did not challenge the order on that basis. Accordingly, we see no reason to overturn the Board's decision.
 
 
 89
 Because all the prerequisites for a Gissel bargaining order are satisfied, we uphold the Board's issuance of such an order.
 
 
 90
 V. THE COMPANY'S ASSISTANCE TO THE STEELWORKERS
 
 
 91
 As we noted above, supra p. 1166, the Board found that on May 1, Bob Davis called two different meetings of employees at the Hempfield store and told them that he wanted them to sign authorization cards for the Steelworkers. When, at one of the meetings, an employee asked what the Steelworkers had to offer the employees, Davis became irate and shouted that they should just sign the cards. After each meeting, Davis sent the employees to a room where Steelworkers representatives distributed authorization cards and union contracts to them. At one point, Davis poked his head through the doorway of one of these rooms and reminded the workers to sign the cards.
 
 
 92
 The Board found that by rendering this assistance to the Steelworkers, the Company violated section 8(a)(2) of the Act, which forbids an employer "to dominate or interfere with the formation ... of any labor organization or contribute financial or other support to it." 29 U.S.C. Sec. 158(a)(2). The Company contests this ruling. It points out that Piccolo, a Steelworkers organizer, testified before the ALJ that when he visited Hempfield on May 1, he deceptively informed Davis that he wanted to speak to Greensburg employees working at the Hempfield facility about transfer policy. Consequently, the Company argues, Davis did not intend to help the Steelworkers organize Hempfield employees when he called the meetings.
 
 
 93
 There are several flaws in the Company's argument. First of all, the ALJ specifically found Piccolo to be a non-credible witness, and we accord great deference to the credibility determinations of a judge who observed a witness testify. Second, the groups of employees gathered by Davis on May 1 included workers who were not Greensburg transfers. This fact belies the Company's assertion that Davis was simply assembling Greensburg employees to talk to Piccolo about transfer policy. Finally, regardless of the purported purpose of the meetings, the Company offers nothing to call into question the Board's finding that at these meetings, Davis personally ordered the employees to sign Steelworkers cards. Accordingly, we affirm the Board's conclusion that the Company violated section 8(a)(2) by assisting the Steelworkers.
 
 
 94
 VI. REFUSAL TO ALLOW PICKETING ON COMPANY PROPERTY
 
 
 95
 From the time twelve pickets began marching on the sidewalk in front of the Hempfield store on May 23, 1986, to protest the Company's unfair labor practices, the Company conducted a relentless campaign to keep the pickets off its property. See supra p. 1166. Moreover, the Company invited three organizers from the Steelworkers to come inside the store to attempt to organize the employees. See supra p. 1166. The Board found that the Company's "disparate treatment of protected union activity" violated section 8(a)(1) of the Act. The Company challenges this finding.
 
 
 96
 The Board and the courts have long been engaged in an effort to resolve conflicts between private property rights and the rights granted by section 7 of the NLRA, "and to seek a proper accommodation between the two." Central Hardware Co. v. NLRB, 407 U.S. 539, 543, 92 S.Ct. 2238, 2241, 33 L.Ed.2d 122 (1972). This accommodation "must be obtained with as little destruction of one as is consistent with the maintenance of the other." NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956).
 
 
 97
 In Babcock, the Supreme Court addressed the issue of whether an employer may bar nonemployee union organizers from his property. The Court placed a high burden on attempts by such organizers to force an employer to grant them access. It held that the union must show that it has no other reasonable means of communicating its organizational message to the employees or that the employer's access rules "discriminate against the union by allowing other distribution." Babcock, 351 U.S. at 112, 76 S.Ct. at 684. See also Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 205, 98 S.Ct. 1745, 1761-62, 56 L.Ed.2d 209 (1978) (construing Babcock ).
 
 
 98
 Babcock suggested that when the NLRA requires an employer to grant access to his property to nonemployee organizers, it does so only to protect the rights of his employees. The employer will be forced to allow the nonemployees on his premises if they lack a reasonable alternative means to reach his employees, but only because his employees' "right of self-organization depends in some measure on [their] ability ... to learn the advantages of self-organization from others." Babcock, 351 U.S. at 113, 76 S.Ct. at 685. Recently, in a similar context, the Court made clear that "the NLRA confers rights only on employees, not on unions or their nonemployee organizers." Lechmere, Inc. v. NLRB, --- U.S. ----, ----, 112 S.Ct. 841, 845, 117 L.Ed.2d 79 (1992).
 
 
 99
 The pickets in the present case were not soliciting support for Local 23 among the Hempfield employees. Rather, they were protesting the Company's unfair labor practices by carrying signs and distributing leaflets to customers. The Company raises the valid question of whether, in light of Babcock and Lechmere, an employer can ever be required to grant nonemployees access to his property if they seek such access to communicate, not with employees, but with customers. Since the NLRA does not confer rights on nonemployees (including customers), neither the givers nor receivers of information are protected in such a situation. This principle would seem to extend even to cases of alleged discriminatory denial of entry, so long as the people denied access are nonemployees and they seek to communicate with customers.
 
 
 100
 The Company is mistaken, however, when it suggests that all of the pickets banished from the grounds of the Hempfield store were nonemployees. In fact, six of the twelve pickets who began their protest on May 23 were unquestionably "employees" under the Act. Two of them, Linda Kunkle and Peggy Black, were still actively employed by the store at that time. Four others--Debra Defibaugh, Sharlene Shotts, Sonja Welsh, and Lance Good--had been laid off in violation of section 8(a)(3). See supra, pp. 1167-70. According to section 2(3) of the Act, an unlawfully discharged worker retains her status as an "employee." 29 U.S.C. Sec. 152(3) ("The term 'employee' shall include any ... individual whose work has ceased ... because of any unfair labor practice...."). We therefore must consider whether the Company violated the Act by refusing access to these six employees.
 
 
 101
 The Board found that the denial of access was impermissible because of Babcock's prohibition against discriminatory treatment of protected union activity. The Board's conclusion that the picketing in question was a protected activity subject to the Babcock analysis is clearly correct. Although Babcock itself concerned organizational rights, the Court has stated that the Babcock analysis extends to section 7 rights other than organizational activity. See Sears, 436 U.S. at 204, 98 S.Ct. at 1761. Picketing to protest unfair labor practices is such a right.
 
 
 102
 The Court has further indicated that "the 'locus' of the 'accommodation of Sec. 7 rights and private property rights ... may fall at differing points along the spectrum depending on the nature and the strength of the respective Sec. 7 rights and private property rights asserted in any given context.' " Sears, 436 U.S. at 204, 98 S.Ct. at 1761 (quoting Hudgens v. NLRB, 424 U.S. 507, 522, 96 S.Ct. 1029, 1038, 47 L.Ed.2d 196 (1976)). The specific characteristics of this case weigh toward granting access. First of all, the Board has labelled the right to protest unfair labor practices one of the "core" section 7 rights, along with the right to organize employees. Jean Country, 291 N.L.R.B. No. 4 at 5, 1988 WL 214053. Second, the pickets desired access only to the outside of the store.
 
 
 103
 Third, in this case, the Company's discriminatory behavior was particularly egregious. In particular, the Company invited at least three Steelworkers' representatives inside the store to recruit employees and to distribute authorization cards and contracts. This strikingly disparate treatment of the supporters of the two unions is a clear violation of the Babcock requirement that the Company's access rules "[do] not discriminate against the union by allowing other distribution." 351 U.S. at 112, 76 S.Ct. at 684.
 
 
 104
 Because the Company denied access to the six employee pickets while it permitted Steelworkers representatives to enter the Hempfield store to organize employees, we uphold the Board's finding that the Company's conduct constituted unlawful disparate treatment of protected union activity in violation of section 8(a)(1) of the Act.
 
 
 105
 VII. CONTINUED MAINTENANCE OF THE STATE TRESPASS SUIT
 
 
 106
 As we noted above, supra p. 1166, on May 28, 1986, the Company acquired a state court injunction enjoining Local 23 from picketing on the Hempfield store grounds. On July 25, the General Counsel issued a complaint alleging that the Company had violated section 8(a)(1) of the Act by denying Local 23 access to the premises and by pursuing the trespass suit. Nevertheless, in the following months, the Company continued to maintain the lawsuit in state court. It enforced the injunction through the assistance of the county sheriff and obtained a state court order requiring Local 23 and four pickets to show cause why they should not be held in contempt of court for demonstrating on the sidewalk in front of the store.
 
 
 107
 The Board found that the Company had violated section 8(a)(1) of the Act by continuing to prosecute the lawsuit after the General Counsel issued the complaint. 306 N.L.R.B. No. 86 at 6, 1992 WL 41351. In reaching this conclusion, the Board relied on Loehmann's Plaza, 305 N.L.R.B. No. 81, 1991 WL 251696. In that case, the Board held that once the General Counsel issues a complaint alleging the unlawful exclusion of employees or union representatives from an employer's property, any state court lawsuit seeking to enjoin picketing or handbilling on the property is preempted by the Board's proceedings and by federal law. The Company thereafter must take affirmative action to stay the state court proceeding. The failure to do so within seven days of the issuance of the complaint constitutes a violation of section 8(a)(1). Id. at 7-8 and 10, 1992 WL 41351.
 
 
 108
 The Company offers a purely legal challenge to the Board's finding of an 8(a)(1) violation in the present case. It contends that the NLRB's conclusion in Loehmann's Plaza that the General Counsel's complaint triggers preemption is contrary to Supreme Court precedent. In effect, therefore, we are being asked to review the Loehmann's Plaza decision.
 
 
 109
 Long ago, the Supreme Court held, "When an activity is arguably subject to Section 7 or Section 8 of the Act, the States ... must defer to the exclusive competence of the NLRB if the danger of state interference with national policy is to be averted." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). The disagreements since then have focused on when an activity is "arguably subject" to the Act.
 
 
 110
 In Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Court held that NLRB jurisdiction does not preempt state court jurisdiction if the union does not file a charge with the Board; otherwise, the employer would be left with no forum in which to adjudicate the dispute. Id. at 201, 98 S.Ct. at 1759-60. In such a situation, "[o]nly by proceeding in state court ... could [the employer] obtain an orderly resolution of the question whether the Union had a federal right to remain on the property." Id. at 202, 98 S.Ct. at 1760.
 
 
 111
 Preemption thus cannot occur before the union files an unfair labor practice charge. Sears left open the question, however, as to whether anything in addition to the filing of the charge is required to establish that the conduct at issue is "arguably" protected or prohibited by the NLRA and that state court jurisdiction is thus preempted. The majority in Sears, although it did not settle the question, strongly suggested that the union's filing of an unfair labor practice charge is sufficient in and of itself to trigger preemption. Justice Blackmun, in a concurring opinion, argued that the "logical corollary" of the majority's opinion is that state court jurisdiction is preempted once the union files a charge with the Board. Sears, 436 U.S. at 209, 98 S.Ct. at 1763 (Blackmun, J., concurring). In a separate concurrence, Justice Powell dated preemption later, at the time the General Counsel issues a complaint. Id. at 212-14, 98 S.Ct. at 1765-66 (Powell, J., concurring). The three dissenting justices, Justices Brennan, Stewart, and Marshall, asserted that there should be preemption even in the absence of a charge. Id. at 222-24, 98 S.Ct. at 1770-71 (Brennan, J., dissenting).
 
 
 112
 Of all the justices, Justice Powell thus advanced the most conservative approach, suggesting that a state lawsuit should not be preempted until the General Counsel issues a complaint. In Loehmann's Plaza, the NLRB adopted the Powell approach, holding that "the General Counsel's decision to issue a complaint signifies that a showing has been made that the union picketing or handbilling is arguably protected by the Act, the substantive requirement of preemption." 305 N.L.R.B. No. 81 at 8, 1991 WL 251696.
 
 
 113
 It might well be legitimate to argue that the Board was wrong not to find that preemption is triggered earlier, by the filing of a charge. But in the present case, the Company takes an extreme position in the other direction, contending that not even a complaint by the General Counsel is sufficient to establish that an issue is arguably covered by the Act and thus subject to exclusive NLRB jurisdiction. Not one justice on the Sears Court adopted such a stringent stance on preemption.
 
 
 114
 In support of its argument, the Company turns to the Supreme Court's decision in International Longshoremen's Ass'n, AFL-CIO v. Davis, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986). That case states:
 
 
 115
 If the word "arguably" is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor. That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been "authoritatively rejected" by the courts or the Board.... The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation.
 
 
 116
 Id. at 395, 106 S.Ct. at 1914.
 
 
 117
 The Company argues that the issuance of a complaint does not satisfy this test. We find the Company to be patently wrong. As the Board pointed out in Loehmann's Plaza, "[B]efore the General Counsel issues a complaint, he conducts an investigation in order 'to ascertain, analyze, and apply the relevant facts.' " 305 N.L.R.B. No. 81 at 8, 1991 WL 251696 (citing NLRB Casehandling Manual). According to the Board's regulations, a complaint will issue only if "the charge appears to have merit." 29 C.F.R. Sec. 101.8. "If investigation reveals that there has been no violation of the Act or evidence is insufficient to substantiate the charge," no complaint will issue. 29 C.F.R. Sec. 101.5. The Company cannot credibly contend that a claim that makes it through this gauntlet does not concern conduct "arguably" protected by the NLRA.
 
 
 118
 We find that the federal preemption is triggered by the issuance of a complaint by the General Counsel, if not earlier. We therefore uphold the Board's conclusion that the Company violated section 8(a)(1) of the Act by continuing to prosecute the state trespass case after the General Counsel had issued his complaint.
 
 VIII. CONCLUSION
 
 119
 We uphold all of the Board's findings of unfair labor practices and its issuance of a bargaining order. We remand only so that the Board, for purposes of continuing representation, can determine the unit placement of any of the six employees whose status the Board did not previously determine who still work at the Hempfield store.
 
 
 120
 It is so ordered.